UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| GREATER NEW YORK TAXI ASSOCIATION, and EVGENY FREIDMAN,<br><br>                                        Plaintiffs,<br><br>                 -against-<br><br>THE CITY OF NEW YORK, THE NEW YORK CITY TAXI & LIMOUSINE COMMISSION, a New York City charter-mandated agency, MICHAEL R. BLOOMBERG, individually and in his capacity as Mayor of the City of New York; DAVID YASSKY, individually and in his capacity as Chairman of the New York City Taxi and Limousine Commission; and DOES 1-9, individually and in their capacity as agents or employees of the City of New York,<br><br>                                        Defendants. | 13 Civ. 3089 (VSB)<br><br><br>**THIRD AMENDED**<br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

        Plaintiffs, Greater New York Taxi Association ("GNYTA") and Evgeny Freidman ("Freidman"), as and for their Third Amended Complaint in this action, allege as follows:

### Nature of the Action

        1.        This action arises from Defendants' unconstitutional retaliation against Plaintiffs for Plaintiffs' opposition to elements of the New York City Taxi & Limousine Commission's ("TLC") regulatory agenda.  As part of their retaliatory efforts, Defendants selectively and abusively used their regulatory enforcement powers against Plaintiffs, punishing Plaintiffs for simply speaking their mind.

2.     Plaintiffs have opposed — and continue to oppose — each successive attempt by the TLC to advance its so-called "Taxi of Tomorrow" program – a program by which TLC sought to require that all taxicab medallion owners buy a single taxi vehicle.

3.     Defendants have engaged in a prolonged campaign to impose fines and suspensions against targeted medallion owners in a cynical effort to blackmail Plaintiffs into withdrawing their various Article 78 proceedings opposing the Taxi of Tomorrow program, thus violating Plaintiffs' constitutional right to petition the courts for redress of grievances.

4.     Defendants made no secret about their intentions in issuing a barrage of fines and suspensions to entities affiliated with Plaintiffs. Indeed, Defendants explicitly informed Plaintiffs that fines and suspensions were being issued as a quid pro quo for Plaintiffs' continued opposition to the Taxi of Tomorrow.

5.     Indeed, following the first instance of the Taxi of Tomorrow program being struck down, Defendant Michael R. Bloomberg ("Bloomberg"), personally threatened Plaintiff Freidman during halftime of a Knicks/Pacers playoff game at Madison Square Garden, stating, ***"When I am out of office I will destroy your fucking industry"*** and then stating, "***after January, I am going to destroy all you fucking guys."***

6.     As Plaintiffs persisted in their legal challenges to the various iterations of the TLC's Taxi of Tomorrow program, Defendants steadily increased the scope of their retaliation, expanding beyond TLC-issued fines and suspensions to initiate a New York State Attorney General investigation into Plaintiffs and to interfere with Plaintiffs' expansion to other municipalities.

7.     Defendants even went so far as to hold a press conference to boast about the scope of the retaliatory fines imposed on Plaintiffs in an effort to tarnish Plaintiffs' reputation.

8.      Defendants issued a press release about a different fleet owner without actually naming the fleet owner, while at the same time naming and disparaging plaintiff Freidman.

9.      Upon information and belief, Defendants have more recently continued their retaliatory campaign by pressuring and working with the New York State Attorney General's office to bring suit against Freidman and his companies.

10.     Upon information and belief, Defendants have also contrived to damage Plaintiffs financially by pressuring Citibank, N.A. ("Citibank") to wrongly accelerate loans issued to Freidman's companies – causing the destruction of Plaintiffs' relationship with Citibank and the possible destruction of portions of Plaintiffs' business.

11.     Further, upon information and belief, Defendants are continuing their retaliatory campaign through a concerted effort to aid Plaintiffs' competitors, such as Uber and Lyft, which are transportation network companies.

12.     As a direct result of Defendants' extortionate and retaliatory practices, Plaintiffs have suffered — and continue to suffer — serious harm, necessitating the present action.

## The Parties

13.     GNYTA is a trade association that has represented, during the operative facts in this complaint the owners of approximately 1,500 taxicab medallions operating in New York City.

14.     Freidman is a resident of the State and City of New York. Freidman owns, directly or indirectly, a substantial number of taxicab medallions and, through four separate management companies, operates as the agent for numerous other taxicab medallion owners. Freidman is also a member of the Board of Directors of GNYTA.

15.     Defendant City of New York (the "City") is a municipality organized and existing under the laws of the State of New York. At all times relevant to this action, the City, acting through the TLC, was responsible for issuing directives and summonses to medallion owners as well as negotiating with Plaintiffs in connection with the owners' compliance with TLC rules and the conduct of the Taxi of Tomorrow Proceeding.

16.     Defendant New York City Taxicab & Limousine Commission is an administrative agency of the City of New York, created under section 2300 of the City Charter. The TLC's purpose is, among other things, to regulate the taxi and limousine industry and to establish "standards for driver safety, standards for equipment safety and design; [and] standards for noise and pollution control." N.Y.C. Charter § 2300.

17.     Defendant Bloomberg is sued in his individual capacity as well as in his capacity as the former Mayor of the City of New York.  At the time this action was filed, Bloomberg was the Mayor and highest-ranking official in the City and was ultimately responsible for the direction and oversight of the TLC, the implementation of its policies, and, upon information and belief, the use of TLC's police power to punish GNYTA and Freidman for the exercise of their constitutional rights.

18.     During his tenure as Mayor, the TLC was controlled by Bloomberg, and consisted of nine members, all of whom were appointed by Bloomberg with the advice and consent of the City Council.

19.     In January 2014, Bloomberg's term as Mayor of New York City ended.  Upon information and belief, Bloomberg has continued to use his influence and financial wherewithal to attempt to make good on his promise to "destroy" Plaintiffs and their industry.

20.     Defendant David Yassky ("Yassky") is sued individually and in his official capacity as the Commissioner, Chairman and Chief Executive Officer of the TLC.  At the time this action was filed, Yassky held his position at the TLC, a position he had occupied since March 2010, when he was nominated by Bloomberg for a seven-year term.  During his tenure as Commissioner, Chairman and Chief Executive Officer of the TLC, Yassky was responsible for the enforcement of TLC regulations, as well as personally directing the TLC's litigation posture in the Taxi of Tomorrow Proceeding.

21.     Yassky served as Commissioner, Chairman and Chief Executive Officer of the TLC until the end of the Bloomberg administration, in January 2014.

22.     Upon information and belief, DOES 1-9 are City employees who participated personally in the Defendants' extortionate attempt to force Plaintiffs to withdraw their opposition to the Taxi of Tomorrow under threat of vindictive prosecution for violation of various TLC directives.

### Jurisdiction and Venue

23.     This Court possesses original subject matter jurisdiction over this action under 28 U.S.C. § 1331 because the Complaint alleges claims which arise under the Constitution and laws of the United States.

24.     Venue is properly founded in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendants are subject to personal jurisdiction within this judicial district and/or because a substantial part of the events giving rise to these claims occurred within this judicial district.

**Facts**

*The Taxi of Tomorrow*

25.     The genesis of this action was the adoption by the TLC of amendments to Chapter 51 of the Rules of the City of New York, requiring all owners of unrestricted taxicab medallions to purchase the Nissan NV200 as New York City's Official Taxicab Vehicle starting in October 2013, to the exclusion of all other makes and models, for a 10-year period (the "Initial Taxi of Tomorrow Rules").

26.     Plaintiffs faced grave practical and economic consequences if the Initial Taxi of Tomorrow Rules were allowed to go into effect.  Those risks included, but were not limited to, the loss of their ability to choose from among competing manufacturers, exposure to the possibility of a fleet-wide recall by Nissan, or an interruption in the availability of replacement parts.  Thus, Plaintiffs had urgent reasons to exercise their constitutional right of access to the courts.

27.     Historically, the New York City taxicab fleet has been comprised of various makes and models supplied by numerous manufacturers.  Allowing medallion owners to choose from among different manufacturers promotes competition and prevents a catastrophic shutdown of taxi service in the City in the event one manufacturer cannot satisfy the demand for vehicles or replacement parts.

28.     So long as a vehicle met the design, safety and engineering standards in the TLC's "Rules for Taxicab Hack-Up and Maintenance" (35 RCNY §§ 67-01 *et seq.*), medallion owners have historically been free to purchase from any manufacturer.  The medallion owner would purchase a new vehicle just like any other buyer would, but the medallion owner would then arrange for the car to be delivered to a shop that would "hack up" the car, *i.e.*, modify the

interior of the vehicle and convert it into a TLC-compliant taxicab. With the adoption of the Initial Taxi of Tomorrow Rules, the owners' freedom of choice was in jeopardy.

29.     In December 2009, the TLC issued a request for proposals ("RFP"), inviting auto manufacturers and designers to submit designs for an "iconic" NYC taxicab to be called the "Taxi of Tomorrow."   The RFP enumerated various criteria, including, among other things, safety standards, purchase price and maintenance costs, environmental impact, and accessibility considerations.

30.     In November 2010, the TLC announced three finalists for the Taxi of Tomorrow contract: Karsan, Ford, and Nissan.   Thereafter, the TLC held an online public opinion poll to determine the public's reaction to the three finalists.   The Karsan received 76% of votes, the Ford Transit Connect received 23% of votes, and the Nissan was far behind, with a paltry 2% of votes (total exceeds 100% due to rounding).

31.     On May 30, 2011, the TLC announced that the Nissan NV200 was the winner of the Taxi of Tomorrow competition even though the Nissan NV200 failed to comply with the criteria set forth in the RFP and received the least number of votes.

32.     In addition to failing to comply with the RFP, the NV200 suffered from various other infirmities.   It is not available as a hybrid, an issue of particular concern to Freidman and GNYTA because they control the largest number of hybrid electric taxicabs in New York City. Worse yet, the Nissan NV200 is not handicap-accessible, thereby giving rise to potential federal liability for medallion owners under the Americans with Disabilities Act.

33.     The City also established the terms of a 10-year manufacturing and supply contract, known as the "Vehicle Supply Agreement (Taxi of Tomorrow)," granting Nissan the exclusive right to manufacture and supply the Official Taxicab Vehicle and replacement parts

and setting a uniform price — thereby depriving Plaintiffs of their ability to bargain directly with Nissan on the contract.

*The First Article 78 Proceeding*

34.     In short, the Initial Taxi of Tomorrow Rules posed a grave danger to the operation of the entire taxi industry.  That danger was also immediate: the shops that "hack up" automobiles had already begun to close down in anticipation of a flood of pre-fabricated Nissan NV200s (which would not require "hacking up"); part suppliers stopped stocking supplies for medallion owners; and the Manhattan Ford dealer had begun closing down its taxi division.

35.     Plaintiffs were forced to act quickly.  Even if the Initial Taxi of Tomorrow Rules were illegal, potentially catastrophic industry-wide consequences would occur if the owners were compelled to begin buying the Nissan NV200.

36.     Therefore, on January 18, 2013, Plaintiffs commenced an Article 78 proceeding challenging the Initial Taxi of Tomorrow Rules (the "Initial Taxi of Tomorrow Proceeding"). Plaintiffs' Verified Petition sought: (i) an order declaring that the TLC exceeded its rule-making authority in requiring the purchase of a single vehicle from a single vehicle manufacturer; (ii) a judgment that the TLC's adoption of a single make and model was arbitrary and capricious; (iii) an order declaring that the Taxi of Tomorrow Rules contravene Section 19-533 of the Administrative Code, which promotes hybrid-electric taxis; (iv) an order declaring that the Taxi of Tomorrow Rules violated the Americans with Disabilities Act, because the NV200 Nissan does not accommodate wheelchair-bound passengers; and (v) an order declaring that the designation of the NV200 Nissan was arbitrary and capricious in light of economic concerns, fuel efficiency considerations, and other factors.

*Defendants' Retaliatory Motive*

37.     Defendants responded to Plaintiffs' public complaints concerning the Taxi of Tomorrow with retaliatory intent by initiating new efforts to attack Plaintiffs and destroy the Medallion Taxi industry.

38.     The Taxi of Tomorrow imbroglio was not the first controversy involving Bloomberg, the TLC, and the taxi industry.   Beginning in 2008, Bloomberg had repeatedly sought to impose his will upon the taxi industry by regulatory fiat, in violation of the New York State Constitution, the separation of powers doctrine, and existing federal, state and city legislation.   Representatives of the taxi industry, including Plaintiffs, have repeatedly and successfully challenged Bloomberg's overreaching in federal and state courts, giving rise to a vendetta on the part of Bloomberg's office against the taxi industry, and Plaintiffs in particular.

39.     For example, in 2008 the TLC promulgated regulations to promote the purchase of hybrid and clean diesel taxicabs by reducing the maximum rates at which the medallion owners may lease their taxicabs (commonly known as the "Lease Cap") while simultaneously increasing those rates with respect to hybrid vehicles (which, ironically, would have become extinct under the Taxi of Tomorrow Rules).

40.     After a challenge was brought in this Court by a different association of medallion owners, the Metropolitan Taxicab Board of Trade ("MTBOT"), the Hon. Paul A. Crotty, U.S.D.J., held that the TLC's manipulation of the Lease Cap was pre-empted under the federal Energy Policy and Conservation Act (the "EPCA") and the Clean Air Act (the "CAA") and enjoined the TLC from enforcing the new rules. *Metropolitan Taxicab Board of Trade v. City of New York*, 633 F. Supp.2d 83 (S.D.N.Y. 2009).   The Second Circuit affirmed Judge Crotty's

decision on the basis that the regulations ran afoul of, and were pre-empted by, the EPCA. *Metropolitan Taxicab Board of Trade v. City of New York*, 615 F.3d 152 (2d Cir. 2010).

41.     Soon thereafter, the TLC, without any justification or consideration of the effects on the taxi industry, lowered the Lease Cap by shifting liability for the payment of sales tax from the drivers to the owners. The New York Court of Appeals overturned the sales tax change, stating that the disputed rule appeared to be "an arbitrary and capricious decision to transfer money from taxi owners to taxi drivers." *Metropolitan Taxicab Board of Trade v. New York City Taxi & Limousine Comm'n*, 18 N.Y.3d 329 (2011).

42.     Medallion owners (including Plaintiffs) also challenged taxi-related legislation that Bloomberg had improperly engineered through the State legislature to avoid the required approval from the New York City Council under the "Home Rule" provision of the New York State Constitution. That legislation – the so-called "HAIL Act" – allowed non-medallion cabs to pick up street hails for the first time in history, and would not pass the City Council.  The legislation was initially struck down under the Home Rule by the New York Supreme Court, which held that the State legislature only became interested in the HAIL Act, when Bloomberg and Yassky became convinced that their plan could not pass the City Council. *Greater New York Taxi Assn v. State of New York*, Index No. 102783/2012 (Sup. Ct. N.Y. Co. August 17, 2012). That decision, however, was ultimately reversed on appeal. *Greater New York Taxi Ass 'n v. State of New York*, 21 N.Y.3d 289, 993 N.E.2d 393 (2013).

43.     In another action brought by MTBOT, on September 25, 2012, a New York Supreme Court Justice issued a Temporary Restraining Order against the TLC with respect to leasing rules. *See Metropolitan Taxicab Board of Trade v. The New York City Taxi & Limousine Commission*, Index No. 103849/2012 (Sup. Ct. N.Y. Co. Sept. 26, 2012) (the "MTBOT Leasing

Litigation").  The Court enjoined the TLC from enforcing new rules regarding the leasing of vehicles that would have had the effect of retroactively voiding hundreds of existing contracts with drivers. The plaintiffs, an association of medallion owners, argued that the rules violate the Contracts Clause of the United States Constitution.  That matter ultimately settled.

44.     The TLC also enacted a series of rules in July of 2012 that (i) changed the way owners can recoup the costs relating to credit card expenses to the detriment of medallion owners; (ii) mandated significant changes to taxicab exteriors that were anti-consumer and eliminated the iconic look and feel of New York City taxis; and (iii) forced medallion owners to deduct 6 cents per ride from drivers in order to set up an undefined, unselected, and ill-advised health and disability fund that is beyond the powers granted to the TLC by the City Charter. GNYTA challenged these enactments as well. *Greater New York Taxi Ass'n v, The New York Taxi & Limousine Commission*, Index No. 103904/2012 (Sup. Ct. New York County).  While that challenge was ultimately unsuccessful, the 6 cents per ride charge was struck down in litigation brought by taxi cab drivers. *Ahmed v. City of New York*, 44 Misc.3d 228, 988 N.Y.S.2d 842 (Sup. Ct. N.Y. Co., April 8, 2014).

45.     In sum, Bloomberg imposed one illegal directive after another upon the taxi industry in what became nothing short of a vendetta.  Bloomberg's feud with the taxi industry then transformed into a more focused retaliatory series of actions against Plaintiffs for presenting their grievances before the Supreme Court both in the Initial Taxi of Tomorrow Proceeding and in subsequent challenges to the TLC's regulatory agenda.

## *The TLC Directives*

46.     Having already been rebuffed by federal and state courts in other battles with the taxicab industry, and not being prepared to leave the final word on the future of Taxi of

Tomorrow with the New York Supreme Court in the Initial Taxi of Tomorrow Proceeding, Defendants sought for and perceived an opportunity to open a second front, using the police power of the TLC as a tool to circumvent the judicial process behind the scenes.

47.    During 2012, the TLC had served directives upon several hundred taxicab medallion owners, many of which included medallion owners for whom Freidman's management companies served as licensed medallion agents.  The directives generally called upon the owners to produce for inspection copies of lease agreements with the drivers and other documents. Failure to comply with the directives within the time demanded by the TLC could subject the owners to fines and the suspension of their medallions.

48.    Many owners did not immediately comply with the directives.  Instead, Freidman reached an informal arrangement with the TLC pursuant to which the agency refrained from enforcing the directives in light of a pending class action litigation against one of Freidman's management companies, Woodside Management, Inc., which was purportedly brought on behalf of a class of medallion taxi drivers. *Desmangles v. Woodside Mgmt., Inc.,* Index No. 653423/2011.  At first, the TLC allowed Freidman to adjourn compliance with the directives indefinitely, adopting a neutral posture in a private litigation that was dismissed on August 14, 2012.

49.    By letters dated November 2, 2012, the TLC had served directives upon approximately 30 such medallions owners, calling for the production of lease agreements and other documents for the period beginning January 1, 2010 (the "November TLC Directives").  The November TLC Directives, and the directives that preceded them, were ostensibly issued for the purpose of auditing the medallion owners' compliance with regulations concerning the form and

12

content of medallion leases, and demanded that the owners deliver the requested documents to the TLC on or before November 19, 2012.

50.     TLC directives had historically been issued to enforce rules regarding medallion owners' compliance with, *e.g.,* vehicular rules or the licensing of agents.   However, in its attempts at retaliation against Plaintiffs and others who had opposed the TLC's prior efforts against the taxi industry, the TLC has unilaterally converted its power to issue "directives" into a sort of subpoena power that it would not otherwise have as an administrative agency. Emboldened by its purported newfound power, Defendants then used the directive-turned-subpoena as a cudgel with which to bully industry participants, including Plaintiffs, who dared to oppose them in court.

51.     Upon information and belief, similar directives were issued to medallion owners associated with another taxi medallion association, MTBOT, which was still prosecuting the MTBOT Leasing Litigation and opposing the HAIL Act.

52.     However, in a settlement between MTBOT and the TLC, entered into on or about December 1, 2012 (the "December 2012 MTBOT Settlement Agreement"), the TLC agreed to withdraw the directives issued to MTBOT in exchange for, among other things, MTBOT's voluntarily dismissal of its pending claims against the City.   Specifically, the TLC stated in the December 2012 MTBOT Settlement Agreement:

> The TLC has withdrawn all previously issued directives to MTBOT Members and owners of medallions operated by MTBOT Members, requesting copies of leases in effect prior to September 30, 2012, has withdrawn without prejudice all summonses issued to MTBOT Members alleging violations of leasing directives, and has withdrawn all stipulations issued to MTBOT Members and owners of medallions operated by MTBOT Members, alleging violations of TLC Rules based on leases supplied to the TLC for periods on or before September 30, 2012. The TLC agrees that none of these directives, summonses, or stipulations will be reissued and all such investigations and inquiries shall be deemed, for all

13

purposes, closed. The TLC agrees it shall not issue any new directives for the production of leases from MTBOT Members or owners of medallions operated by MTBOT Members, and will not request that any other City Agency issue directives seeking the production of leases, if such lease was only in effect prior to December 31, 2013, except for in conjunction with an investigation of a complaint alleging personal harm initiated by the complainant (or the complainant's attorney or representative), or a state or federal agency, or a City agency other than the TLC.

*See* December 2012 MTBOT Settlement Agreement, attached as Exhibit "A", at par. 5.

53.     Upon information and belief, the TLC had also issued summonses to medallion owners represented by MTBOT related to alleged violations of TLC Rules, including but not limited to 35 RCNY §58-20(a)(1) (the "double shift") rule,[1] and 35 RCNY §58-21(c) (the "Lease Cap") rule, as well as alleged violations of the November 2012 Directives.

54.     Upon information and belief, under the December 2012 MTBOT Settlement Agreement, the TLC withdrew the summonses issued to medallion owners represented by MTBOT and also resolved fines imposed by the TLC for pennies on the dollar.

55.     The City had already used an out-of-court settlement with MTBOT in the Lease Cap litigation before Judge Crotty as a means by which to suppress opposition to the Taxi of Tomorrow initiative.  Specifically, in 2011, MTBOT had entered into a stipulation with the TLC whereby it agreed not to bring any litigation against the City in connection with the anticipated Taxi of Tomorrow Rules, the selection of the Taxi of Tomorrow vehicle, or the contract by which the Taxi of Tomorrow would be designated as the sole source vehicle for unrestricted medallions, and MTBOT further agreed not to assist or cooperate with others in any such litigation.  The stipulation between MTBOT and the City is a matter of public record *(see*

---

[1] TLC Rule 58-20(a)(1) requires a fleet (or mini fleet) to "operate" its taxicab for a minimum of two nine-hour shifts "per day". Failure to do so can result in a $75 fine chargeable to the medallion owner.

*Metropolitan Taxicab Board of Trade, et al., v. City of New York, et al.,* 1:08-cv-7837 (PAC) (Dkt. # 115 (filed May 4, 2011)).

56.    In the December 2012 MTBOT Settlement Agreement, the TLC and MTBOT further agreed to file an amended stipulation in the federal Lease Cap litigation before Judge Crotty, which had the effect of reaffirming MTBOT's prior commitment to support the City's position in the Taxi of Tomorrow matter.

### *Defendants Focus Their Retaliation on GNYTA and Freidman*

57.    Having eliminated MTBOT's objections to the Taxi of Tomorrow through the settlements noted above, the TLC's attention shifted to the Plaintiffs. While the TLC had previously been content to postpone action indefinitely regarding its directives to the medallion owners for whom Freidman's management companies served as agent, the TLC's willingness to accommodate Freidman vanished after January 18, 2013, which was when Freidman and GNYTA filed the Initial Taxi of Tomorrow Proceeding.

58.    Defendants abruptly changed their posture on the directives.  On or about February 12, 2013, less than one month after Plaintiffs filed the Article 78 petition in the Initial Taxi of Tomorrow Proceeding, Defendants issued summonses against the taxicab medallion owners who had received the November TLC Directives.

59.    A hearing was scheduled before an Administrative Law Judge on or about March 14, 2013. However, the hearing was adjourned to April 9, 2013.

60.    Meanwhile, on or about March 25, 2013, defendant Yassky telephoned the Executive Director of GNYTA, Ethan Gerber, Esq., and invited him to a meeting on March 28, 2013, to discuss a resolution of the Initial Taxi of Tomorrow Proceeding.

15

61.     In the conversation with Gerber, Yassky presented Plaintiffs with the same *quid pro quo* he had offered to MTBOT: in return for the TLC's promise to forego seeking fines and suspensions in connection with the November TLC Directives, Plaintiffs would have to abandon their Article 78 challenge to the Taxi of Tomorrow and support Bloomberg's Taxi of Tomorrow initiative. In other words, Yassky was offering to exercise his discretion in a manner favorable to Freidman in exchange for a benefit in the form of political support for the Taxi of Tomorrow.

62.     This was not the first time that Defendants had presented this *quid pro quo* to Plaintiffs.   Indeed, even before GNYTA filed the Initial Taxi of Tomorrow Proceeding, Defendants, anticipating Plaintiffs' objections to the Taxi of Tomorrow, had offered to "eliminate summons for technical violations of TLC rules, and stop our enforcement of past leasecap violations" in exchange for Plaintiffs not challenging the Taxi of Tomorrow and other TLC action.  Attached as Exhibit "B" is an October 11, 2012 email from Yassky to Mr. Robert Steel, an official in Mayor Bloomberg's office, and others, regarding this proposal, which Plaintiffs refused.

63.     Yassky, along with his chief of staff and two other TLC officials, met with Freidman and Gerber at TLC's offices on March 28, 2013.   No representative from the Corporation Counsel's office was present.

64.     At that meeting, Yassky repeated the ultimatum that he had delivered to Gerber over the phone.

65.     On behalf of GNYTA and the other Article 78 petitioners, Freidman refused to withdraw the Initial Taxi of Tomorrow Proceeding.

66.     Several days later, on April 2, 2013, Hon. Peter H. Moulton, J.S.C., heard oral argument on Plaintiffs' Article 78 petition as scheduled.

16

67.     Within days after Freidman declined to withdraw the Taxi of Tomorrow Proceeding, and just one week after oral argument of the Article 78 petition before Justice Moulton in the Initial Taxi of Tomorrow Proceeding, the TLC struck back and proceeded to make good on Yassky's threat.

68.     On April 9, 2013, a TLC representative appeared before an Administrative Law Judge and prosecuted the summonses against the medallion owners for which Freidman's companies serve as agent, seeking fines and suspensions for failure to comply with the November TLC Directives.

69.     The TLC did not pursue these penalties against MTBOT because MTBOT had agreed to withdraw its pending claims against the City and support the Taxi of Tomorrow.

70.     While the medallion owners' representative had previously adjourned the hearing once before and had expected to adjourn the April 9, 2013 hearing date as well, the TLC representative abruptly changed course, informing him that the hearing would, in fact, proceed on April 9, 2013

71.     The Administrative Law Judge ruled in favor of the TLC, imposing a $300 fine for each violation and suspending all of the taxi medallions in question.

72.     Based upon the above, including the MTBOT settlements above and the statements made by defendant Yassky, it is apparent that the fines and suspensions that TLC imposed for non-compliance with the November TLC Directives had nothing to do with the TLC's interest in promoting passenger or vehicular safety, and were nothing more than a contrivance by which to compel GNYTA and Freidman to capitulate in the Initial Taxi of Tomorrow Proceeding.

73.     The TLC later confirmed to Gerber that the imposition of fines and suspensions was a direct consequence of Plaintiffs' failure to abandon their claims in the Initial Taxi of Tomorrow Proceeding. The TLC representative in question stated in particular that the

17

withdrawal of the Article 78 petition was supposed to be the "*quid pro quo*" for avoiding the fines and suspensions that had just been imposed.

74.     Wasting no time, and within only a few hours after the Administrative Law Judge had ruled, the TLC began the process of directing its agents to remotely switch off the medallion owners' access to the meters, thereby preventing the affected medallion taxicabs from being able to charge fares.  As a result of the suspensions and TLC's swift instruction to disable the taxi's meters, the cars were forced off the streets.

75.     Around the same time, another representative of the TLC intimated to Freidman's representative that the suspensions imposed on April 9, 2013 in connection with the November TLC Directives were, in effect, a shot across the bow, and that all of the other medallion owners represented by Freidman could soon find themselves in jeopardy of being similarly shut down for non-compliance with other directives.

76.     In other words, the TLC was unmistakably warning Freidman that if he did not withdraw the Article 78 challenge in the Initial Taxi of Tomorrow Proceeding, the TLC would systematically put Freidman and all the medallion owners for which he acted as agent out of business.

77.     Freidman caused documents responsive to the November TLC Directives to be delivered to TLC on Friday, April 12, 2013.  While TLC lifted the suspensions, it insisted that Freidman's management companies pay the full amount of the fines, in the amount of $11,000, within 30 days.

78.     Counsel for the TLC further confirmed to Freidman's counsel on April 12, 2013 that summonses could be forthcoming for hundreds of additional medallion owners represented by Freidman as early as the following Monday, April 15, 2013.

18

79.     With the threat of vindictive prosecution for Plaintiffs' refusal to withdraw the Initial Taxi of Tomorrow Proceeding looming large, on April 17, 2013, Plaintiffs initially filed this action in the New York State Supreme Court, New York County.

80.     Counsel for the TLC then made good on the threat he had made on April 12, 2013. On or about April 22, 2013, a mere ten days after the threat made by the TLC, and less than a month after the March 28 meeting, the TLC delivered approximately 850 summonses to Freidman as agent for medallion owners who had not complied with directives to supply lease documents to the TLC, *i.e.,* directives similar to the November TLC Directives.   Instead of grounding 40 taxicabs, the City would penalize hundreds more of Freidman's clients in a naked attempt to bully Plaintiffs into withdrawing the Article 78 proceeding, which had not yet been resolved.

### *The May 6 Summons*

81.     Compounding the harassment that it had imposed through the suspensions in April, the TLC issued a new summons on May 6, 2013, to one of the Freidman medallion owners (the "May 6 Summons").   The May 6 Summons, while captioned as a single summons, purportedly charged the medallion owner with 170 <u>separate</u> violations of the requirement that leases be maintained in writing, each one itemized with its own summons ID number, and seeking to impose a separate $500 violation *for each one of 170 week-long shifts* between January 1, 2010 and April 6, 2013.   In other words, the TLC is seeking to impose a cumulative fine of *$85,000* upon the owner, in a transparent, bad faith effort to use the agency's enforcement power in retaliation for opposing the TLC's Taxi of Tomorrow program and as a deterrent to litigation against improper TLC rule making.

19

82.     The TLC's attempt to impose that draconian penalty was motivated solely by the desire to exert leverage upon Plaintiffs through a persisting campaign of harassment in violation of their Constitutional rights and thereby to force them to abandon their challenge to the Initial Taxi of Tomorrow Rules.

83.     The TLC's retaliatory conduct was not limited to the May 6 Summons and the summonses tied to the November TLC Directives.  On January 29, 2013 (less than two weeks after plaintiffs filed the Initial Taxi of Tomorrow Proceeding), the TLC issued hundreds of directives demanding proof that GNYTA medallion owners paid a dispatch fee to drivers of wheelchair accessible vehicles.  The "dispatch fee" is the fee medallion owners pay to the drivers for completing a trip dispatched through the TLC's accessible dispatch program.

84.     Upon information and belief, the TLC had no evidence that the dispatch fees were not paid, nor was there any driver complaining that he or she had not received the dispatch fee.  Apparently, that did not matter to the TLC.  The TLC knew that the GNYTA medallion owners would have to go through the burdensome task of locating, gathering and producing hundreds of payment records.

85.     On April 15, 2013 (less than 2 weeks after oral argument in the Initial Taxi of Tomorrow Proceeding), the TLC converted the dispatch fee directives into summonses. On that same date, the TLC issued a new batch of directives seeking similar dispatch fee payment records — these eventually were converted into summonses as well.

86.     Plaintiffs are not aware of one instance where the GNYTA medallion owner had not in fact paid the dispatch fee.  However, that did not stop the TLC from issuing the summonses, harassing GNYTA members and collecting the fines associated with bringing the

summonses — all in retaliation for Plaintiffs' refusal to withdraw their challenge to the Initial Taxi of Tomorrow Rules.

87.     The TLC's retaliatory conduct continued in other areas. On February 1, 2013, two weeks after plaintiffs filed their Article 78 Petition in the Initial Taxi of Tomorrow Proceeding, the TLC issued directives to approximately 40 medallions operated by Freidman's management companies, requiring production of yet more paperwork – this time seeking copies of all shift receipts, *i.e.,* all documents concerning payments made or received by Freidman's management companies over a five-month period.

88.     Upon information and belief, the TLC had never used directives previously as a means to demand copies of hundreds (if not thousands) of pages of payment-related paperwork from medallion owners or their agents.  Again, the TLC has converted its authority to issue directives into a subpoena-like power to compel medallion owners to produce documents or face the suspension of their medallions.

89.     Starting on or about April 15, 2013, Defendants issued to Plaintiffs more than 2,100 summonses for so-called "double shift" violations.  Upon information and belief, the TLC has not enforced the double shift rule in nearly 30 years, because the taxi business model has completely changed from an employer-employee relationship (where the medallion owners were able to control how many hours a driver worked), to a leasing model where the drivers are independent contractors and lease taxi vehicles from the owners for a flat fee. In the current model, the medallion owners no longer control the drivers' work day once the vehicles are leased to drivers. Indeed, it is in the medallion owners' business interest to lease as to as many drivers as possible, thus making the rule completely unnecessary.  In fact, the TLC has recently issued

statements that it is aware that the rule is obsolete. Thus, the TLC seemingly had recognized that the double shift rule no longer served the regulatory purpose for which it was created.

90. Clearly, that changed once Plaintiffs challenged the Taxi of Tomorrow. Out of nowhere, in order to retaliate against Plaintiffs, the TLC issued over 2,100 double shift summonses to Plaintiffs based on a rule it knew was outdated and unworkable in the current model.

91. Another association of medallion owners, MTBOT, as part of settling its lawsuit against the TLC concerning Driver-Owned Vehicles, agreed to withdraw that lawsuit in exchange for the TLC withdrawing and/or not issuing double shift summonses.

92. Upon information and belief, similar double shift summonses were not issued to MTBOT as a direct result of their agreement with the TLC. Plaintiffs' refusal to withdraw their lawsuit resulted in no such favors for them.

### The Initial Taxi of Tomorrow Rules Are Struck Down

93. On May 15, 2013, Justice Moulton issued a decision striking down the Initial Taxi of Tomorrow Rules, declaring those rules "null, void and unenforceable." *Greater New York Taxi Association, Evgeny Freidman, and Cliff Hammond-Adler v. The New York City Taxi and Limousine Commission, et al.,* Index No. 100135/2013; *Comm. for Taxi Safety, Inc. v. City of New York,* 40 Misc. 3d 930, 971 N.Y.S.2d 793 (Sup. Ct. N.Y. Co. 2013).

94. Justice Moulton held that the Taxi of Tomorrow violated Section 19-533 of the New York City Administrative Code, pursuant to which the City Council had required the TLC to approve one or more hybrid electric vehicles for use as a taxicab by all current and future medallion owners. The Nissan NV200 is not available as a hybrid.

95.     Justice Moulton did not reach the other arguments raised in the Article 78 Petition for the Initial Taxi of Tomorrow Proceedings, *e.g.,* that the TLC lacked the authority to issue the Initial Taxi of Tomorrow Rules.

96.     The Defendants' unyielding desire to impose the Taxi of Tomorrow upon Plaintiffs, the medallion owners, and the rest of the City at all costs and in the face of all opposition is evidenced not only by their retaliatory conduct against the Plaintiffs but by their response to Justice Moulton's ruling.  In the face of that ruling, Yassky wasted no time in announcing that the TLC would proceed as planned and stating, "This ruling will not delay the [Taxi of Tomorrow]'s implementation."

97.     Indeed, the TLC moved forward swiftly with promulgating revised Taxi of Tomorrow Rules that would – the TLC hoped – allow the City to honor its contract with Nissan and make the NV200 the signature taxicab of the City.

### *Bloomberg Escalates and Threatens War Against the Taxi Industry*

**98.**     Any doubt regarding Bloomberg's <u>personal</u> commitment to retaliate against Plaintiffs for their having filed and prosecuted the Taxi of Tomorrow Proceeding was instantly dispelled on the evening of Thursday, May 16, 2013, *i.e.,* the day after Justice Moulton published his ruling.  In a chance encounter at the 1879 CLUB at Madison Square Garden, during the halftime break at the Knicks/Pacers playoff game, Plaintiff Freidman asked Bloomberg whether he had any comment to make regarding Justice Moulton's decision.  Bloomberg became agitated and red faced, clenched his jaw, and responded that, ***"When I am out of office I will destroy your fucking industry"*** and ***"after January, I am 'going to destroy all you fucking guys."***

*The TLC Passes a Second Set of Taxi of Tomorrow Rules*

99.     The TLC then attempted to salvage the Taxi of Tomorrow program by adopting a new set of rules that exempted from the program certain hybrid models with larger passenger compartments (the "Revised Taxi of Tomorrow Rules").

100.    The Revised Taxi of Tomorrow Rules became effective on or about July 27, 2013.

101.    Because the Revised Taxi of Tomorrow Rules implicated many of the same concerns as the Initial Taxi of Tomorrow Rules, Plaintiffs again opposed them.

102.    On July 31, 2013, Plaintiffs filed a new Article 78 proceeding (the "Second Taxi of Tomorrow Proceeding"), opposing the Revised Taxi of Tomorrow Rules and requesting an order striking those rules down for many of the same reasons articulated in the Initial Taxi of Tomorrow Proceeding, including, among other things, that the designation of a single "Official Taxicab Vehicle" exceeded the TLC's authority to set standards for taxicabs and encroached upon the City Council's legislative prerogatives under the separation of powers doctrine.

103.    In an order dated October 8, 2013, the Hon. Shlomo S. Hagler. *J.S.C.* issued an order striking down the Revised Taxi of Tomorrow Rules. *Greater New York Taxi Ass 'n v. New York City Taxi & Limousine Comm'n,* 42 Misc. 3d 324, 972 N.Y.S.2d 513 (N.Y. Sup. Ct. 2013).

104.    Justice Hagler declared that the Revised Taxi of Tomorrow Rules "violated the separation of powers doctrine and . . . exceeded [the TLC's] authority."  Justice Hagler concluded that the TLC's power to set standards for taxicabs does not extend to designating a particular model from a particular manufacturer as the exclusive vehicle that must be purchased by all medallion owners.

24

105.    On June 10, 2014, the Appellate Division, First Department overturned Justice Hagler's Decision, *Greater New York Taxi Ass'n v New York City Taxi and Limousine Corn 'n,* 988 N.Y.S.2d 5 (1st Dep't 2014).

106.    Plaintiffs believe the First Department was in error and appealed to the Court of Appeals.

107.    Plaintiffs' conclusion was only strengthened when the Court of Appeals, confronted with a strikingly similar set of facts, recently decided that the New York City Board of Health exceeded the scope of its regulatory authority in adopting the "Sugary Drinks Portion Cap Rule." *New York Statewide Coalition of Hispanic Chambers of Commerce v. New York City Dept. of Health and Mental Hygiene*, 23 N.Y.3d 681, 16 N.E.3d 538 (2014).

108.    Meanwhile, the TLC has proceeded with a third iteration of the Taxi of Tomorrow Rules designed to circumvent the concerns flagged in both Justice Moulton's opinion in the Initial Taxi of Tomorrow Proceedings and Justice Hagler's opinion in the Second Taxi of Tomorrow Proceedings.

109.    Plaintiffs have opposed the latest version of the Taxi of Tomorrow Rules in yet another Article 78 proceeding. *Greater New York Taxi Ass'n and Evgeny "Gene" Freidman v. The New York City Taxi and Limousine Comm'n and Meera Joshi,* Index No. 100484/2014.

### *The TLC Broadens Its Retaliation to Other Cities and Agencies*

110.    As the battle over the various iterations of the Taxi of Tomorrow rules wore on, the TLC continued to seek leverage to force Plaintiffs to drop their opposition.

111.    Upon information and belief, looking to exert maximum pressure on Plaintiffs, the TLC brought in the New York Attorney General's Office (the "AG") to launch an

investigation of Plaintiff Freidman – an investigation that sought to enforce the same summonses the TLC was issuing in a retaliatory manner to Plaintiffs.

112.    The pressure now came from two fronts, the TLC and the AG.  Faced with the real threat of millions of dollars in fines, medallion suspension and attorneys' fees to defend this retaliatory action, along with the real possibility of business extinction, Plaintiffs were forced to enter into a global settlement in December 2013 to resolve the fines and summonses (the "December 2013 Settlement").

113.    In addition to the sums Plaintiffs were forced to pay in the December 2013 Settlement, Plaintiffs incurred attorneys' fees in defending the retaliatory summonses issued by Defendants – which required nearly daily attendance at hearings in TLC Court for several months in 2013.

114.    Rather than accept their "victory," Defendants actually held a press conference to crow about the settlement with Plaintiffs, which harmed Plaintiffs' reputation in New York City as well as in other cities.

115.    Indeed, Defendants contacted authorities in Boston, Massachusetts regarding Mr. Freidman.

116.    Plaintiff Freidman was seeking to expand his taxi fleet in Boston.

117.    Upon information and belief, the TLC advised the decision-makers in Boston that it should not approve Freidman as a suitable purchaser of taxi medallions in Boston.

118.    The combination of Defendants' decision to bad-mouth Freidman to Boston and the decision to publicize the December 2013 Settlement caused the decision-makers in Boston to reject Freidman's applications in Boston, further damaging his business as well as his reputation in the taxi industry.

119.    At the time of the December 2013 Settlement, Freidman was in the process of establishing a new credit facility.  As a result of Defendants' retaliatory conduct and the negative publicity Defendants initiated against Plaintiffs, Freidman's lender has charged higher interest on the loan Freidman obtained.

120.    Upon information and belief, Defendants have more recently continued their retaliatory campaign by pressuring the New York State Attorney General's office to bring suit against Freidman and his companies, causing further damage to Plaintiffs.

121.    On April 23, 2015, the New York State Attorney General filed a complaint against Freidman and four taxi companies owned by Freidman, as a result of, upon information and belief, pressure from Defendants.

122.    But for the Defendants' vindictive motive against the taxi industry and their obsession with winning the various Taxi of Tomorrow Proceedings at all costs, the TLC would not have adopted the scorched earth approach to the medallion owners represented by Freidman.

123.    Upon information and belief, the foregoing treatment of Freidman's medallions also constituted selective enforcement of TLC Rules vis-à-vis other medallion owners or taxi associations, such as MTBOT.

*Defendants Retaliate Through Aiding Plaintiffs' Competitors*

124.    Upon information and belief, Defendants have continued their retaliatory efforts by working with, or investing in, Plaintiffs' competitors, including Uber and Lyft, which are competing transportation network companies.  Among the examples of this, upon information and belief:

    (a)    Defendant Michael Bloomberg is a principal investor in the venture capital firm Andreseen Horowitz LLC.  Bloomberg invested tens of millions into Andreseen,

which in turn invested $60 million in Lyft.  This was announced shortly after Mr. Bloomberg threatened to "destroy" Plaintiffs and their industry.

(b)     Defendant Yassky is a paid advisor to Lyft.

(c)     Ashwini Chhabra left the TLC and immediately became Head of Policy Development and Community Engagement for Uber Technologies Inc.  Mr. Chhabra was the Deputy Commissioner for Policy and Planning of the TLC.  He was directly involved in all policy positions, including the pilot program which allowed applications to operate and base licenses for Uber.

(d)     Stu Losier, defendant Bloomberg's long time press secretary, is a spokesperson for Uber.

(e)     Bradley Tusk managed defendant Bloomberg's 2009 campaign.  Mr. Tusk's firm, Tusk Strategies, is working for Uber on its "Regulatory Hurdles".

125.     Upon information and belief, Defendants, through investing in, and directing, Plaintiffs' competitors, have continued their campaign to retaliate against Plaintiffs; thus making good on defendant Bloomberg's threat: "***after January, I am going to destroy all you fucking guys.***".

126.     Upon information and belief, after leaving office, defendants Bloomberg and Yassky have continued to use their influence with the City and the TLC to cause the City and the TLC to continue to pursue the retaliatory agenda that was set in motion during Bloomberg's tenure as Mayor.

*Defendants Retaliate Through Interference with Plaintiffs' Relationship with Citibank*

127.     Additionally, upon information and belief, even after his tenure as Mayor ended, Bloomberg has used his wealth and influence to continue to retaliate against Plaintiffs.  Indeed,

28

as would reasonably expected, Freidman was required to develop and maintain banking relationships and secure substantial loans to support his Taxi business.  Defendants' retaliatory use of TLC directives, when combined with their assistance to Plaintiffs' competitors (including defendant Bloomberg's significant investment in Plaintiffs' competitors), inevitably caused Plaintiffs to experience certain financial difficulties which necessarily had a detrimental impact on Plaintiffs' banking relationships and loan obligations.

128.    In or around January 2012, Freidman entered into a banking relationship with Citibank N.A. ("Citibank") at which time he transferred over $200 million into Citibank accounts.

129.    One of the main issues facing Freidman's business' financial affairs was the fraudulent use of checks.

130.    Freidman entered into the relationship with Citibank because Citibank represented that it could provide a unique and customized cash management solution that was specifically created to solve Freidman's issues with fraudulent checks and to streamline the operation of the taxi businesses he managed (the "Cash Management and Lending Solution").

131.    The Cash Management and Lending Solution included the opening of cash management accounts (the "Cash Management Accounts").

132.    A cash management account is a cash management solution offered to businesses when a company has a large volume of checks and disbursements made on a daily basis.

133.    Each Cash Management Account is comprised of an operating account and a funding account.  The operating account and the funding account both carried zero balances pursuant to Freidman's agreement with Citibank and/or the parties' course of performance.

134.    In connection with the Cash Management and Lending Solution, Freidman also negotiated a $21 million loan and a $10 million loan with Citibank for his businesses and provided Citibank with personal guaranties in connection with said loans (the "$21 Million Loan" and the "$10 Million Loan" respectively).

135.    Citibank also provided a $1.5 million line of credit associated with the Cash Management and Lending Solution (the "$1.5 Million Line of Credit") (the $21 Million Loan, the $10 Million Loan, the $1.5 Million Line of Credit and the related guaranties will be referred to collectively as the "Loan Agreements").

136.    On or around May 8, 2014, a week before Justice Moulton struck down the Initial Taxi of Tomorrow Rules, Citibank sent Freidman a letter notifying him that it would be terminating the Cash Management Accounts effective May 23, 2014.

137.    The May 8, 2014 letter did not provide a justification for Citibank's actions.

138.    On or about November 6, 2014, Citibank sent Freidman a letter informing him that Citibank would be terminating the entire banking relationship between Freidman, his companies, and Citibank effective December 15, 2014.

139.    The November 6, 2014 letter provided Freidman with only five weeks to find a new banking institution.  This created a state of chaos within all of Freidman's business entities.

140.    During this transitional stage, on or about December 4, 2014, Citibank sent Freidman notices of default related to the loan agreements based on alleged failure to make monthly payments due on December 1, 2014.

141.    The notices of default were sent a mere three days after payment was allegedly due, even though Citibank was explicitly aware that Freidman and his companies were in the

30

process of seeking an alternate banking relationship, as a result of Citibank's November 6, 2014, which would include refinancing the outstanding loans maintained with Citibank.

142.   In the notices of default, Citibank accelerated each of the outstanding loans so that the total balances became immediately due and payable.

143.   Citibank had no good-faith reason to accelerate the loans.

144.   Upon information and belief, during the time that Citibank's relationship with Friedman deteriorated, including Citibank's termination of the banking relationship, unprecedented acceleration of the loans, and subsequent efforts to collect debts currently in dispute, Citibank and/or its agents had been in contact with Defendants and/or their agents.  In light of Citibank's sudden change of attitude in dealing with Friedman, it appears that Citibank's change in attitude towards Plaintiffs was influenced by Defendants and/or their agents in this matter.  Certainly, Citibank's unprecedented conduct would support Bloomberg's promise to "destroy" Plaintiffs.

### *Defendants' Continuing Issuance of Summonses*

145.   Since the initial filing of this action, Defendants have continued to retaliate against Plaintiffs by issuing further summonses and fines against Plaintiffs.

146.   The additional summonses related to, among other things, alleged violations of the dispatch fee, and alleged violations relating to payments to the New York City Department of Finance ("TXF" summons) and the Taxi Accessibility Fees ("WF" summons).

147.   The TLC continued to issue these summons in order to retaliate against Plaintiffs for their continued opposition to the Taxi of Tomorrow.

148.    Plaintiffs have been forced to pay sums to settle the continued retaliatory summonses and Plaintiffs have incurred attorneys' fees in defending the retaliatory summonses issued by Defendants.

**As and For Plaintiffs' First Cause of Action**
**(Constitutional Retaliation)**

149.    Plaintiffs repeat and re-allege paragraphs 1 through 148 of the Third Amended Complaint as if fully set forth herein.

150.    Plaintiffs had the right to associate and to petition the government, including through the filing of litigation, for redress of their grievances pursuant to the First and Fourteenth Amendments to the United States Constitution.

151.    By reason of the foregoing, the Defendants, while acting under color of state law, targeted taxicab medallion owners whose interests were represented by Plaintiffs and/or treated Plaintiffs differently from similarly situated medallion owners and other taxi associations in that the Defendants selectively prosecuted Freidman's medallion owners in retaliation for the Plaintiffs' filing and active prosecution of the Taxi of Tomorrow Proceeding.

152.    In particular, the TLC treated Plaintiffs differently from MTBOT in that the TLC withdrew summonses and directives to medallion owners represented by MTBOT related to alleged violations of TLC rules, including but not limited to the double shift rule and the Lease Cap rule, as well as alleged violations of the November 2012 Directives, because MTBOT agreed to support the Taxi of Tomorrow.

153.    Because Plaintiffs did not support the Taxi of Tomorrow, they were forced to enter into the December 2013 to resolve the fines and summonses issued by the TLC.

154.    The Defendants' retaliatory animus is further evidenced by Bloomberg's personal threat to destroy Plaintiffs and their industry.

155.    The Defendants' retaliatory campaign against the Plaintiffs' is further evidenced by their investing in, and working for, Plaintiffs' competitors, and influencing Citibank to accelerate its loans with Freidman and his companies.

156.    By reason of the foregoing, the Defendants, acting under color of state law, retaliated and are continuing to retaliate against Plaintiffs for exercising their rights of association in connection with their common concern as members of the taxicab industry and their right of access to the Courts of this State to petition for redress of wrongs committed by the TLC.

157.    Bloomberg, Yassky, and the Does each directly participated in the process by which Defendants sought to burden Plaintiffs' exercise of their constitutional rights.

158.    As a direct and proximate result of Defendants' retaliatory conduct, Plaintiffs have suffered, and continue to suffer, serious harm.

**As and For Plaintiffs' Second Cause of Action**
**(Selective Enforcement)**

159.    Plaintiffs repeat and re-allege paragraphs 1 through 158 of the Third Amended Complaint as if fully set forth herein.

160.    Defendants selected to enforce certain TLC regulations against Plaintiffs, by, among other things, levying enormous fines and suspensions and imposing onerous requirements to produce a large number of documents.

161.    Other entities regulated by Defendants and similarly situated to Plaintiffs were not subject to such fines, suspensions, and production demands.

33

162.    Indeed, some entities were specifically carved-out of their obligation to comply with TLC rules that were enforced against Plaintiffs.

163.    In particular, the TLC treated Plaintiffs differently from MTBOT in that the TLC withdrew summonses and directives to medallion owners represented by MTBOT related to alleged violations of TLC rules, including but not limited to the double shift rule and the Lease Cap rule, as well as alleged violations of the November 2012 Directives, because MTBOT agreed to support the Taxi of Tomorrow.

164.    Defendants' selective treatment of Plaintiffs was motivated by a bad faith intent to persuade Plaintiffs to drop their constitutionally-protected right to oppose Defendants' regulatory agenda.

165.    In fact, Defendants admitted to Plaintiffs on more than one occasion that Plaintiffs were being specifically singled out for fines, suspensions, etc. in an effort to get Plaintiffs to drop their opposition to Defendants' Taxi of Tomorrow initiative.

166.    Defendants' bad faith motivation is further evidenced by Bloomberg's personal threat to destroy the whole industry.

167.    Bloomberg, Yassky and the Does each directly participated in the process by which Defendants sought to selectively enforce certain measures against Plaintiffs to dissuade Plaintiffs' exercise of their constitutional rights.

168.    As a direct and proximate result of Defendants' selective and abusive conduct, Plaintiffs have suffered, and continue to suffer, serious harm.

**As and For Plaintiffs' Third Cause of Action**
**(Conspiracy to Commit Constitutional Retaliation/Selective Enforcement)**

169.    Plaintiffs repeat and re-allege Paragraphs 1 through 168 of the Third Amended Complaint as if fully set forth herein.

170.    As set forth above, the Defendants, or any of them, conspired together for the purpose of depriving the Plaintiffs of the aforementioned constitutional rights and to selectively enforce certain regulations against Plaintiffs.

171.    Upon information and belief, Defendants conspired with Citibank to cause Citibank to accelerate its loans with Freidman's companies.

172.    Upon information and belief, after leaving office, defendants Bloomberg and Yassky have continued to use their influence with the City and the TLC to cause the City and the TLC to continue to pursue the retaliatory agenda that was set in motion during Bloomberg's tenure as Mayor.

173.    As a direct and proximate result of Defendants' conspiratorial conduct, Plaintiffs have suffered — and continue to suffer — serious harm.

WHEREFORE, Plaintiffs demand judgment against the Defendants as follows:

A.    Awarding compensatory damages in an amount to be determined at trial;

B.    Granting a permanent injunction enjoining Defendants from any further actions in retaliation against Plaintiffs' exercise of their constitutional rights, including but not limited to, an injunction preventing Defendants or any of their agents or employees from issuing directives or summonses to taxicab medallion owners for any purpose unrelated to the regulation of medallion taxicabs in the ordinary course of the TLC's business;

35

C.      Awarding punitive damages in an amount to be determined by the jury;

D.      Awarding Plaintiffs their costs and attorneys' fees in connection with this action; and

E.      Granting such other and further relief that to the Court seems just and proper.

Dated: July 23, 2015
New York, New York

**FOX ROTHSCHILD LLP**

 /s/ James M. Lemonedes
James Lemonedes, Esq.
Brett A. Berman, Esq.
100 Park Avenue, 15th Floor
New York, NY 10017
Tel: (212) 878-7900
Fax: (212) 692-0940
jlemonedes@foxrothschild.com
bberman@foxrothschild.com
*Attorneys for Plaintiffs*

**Jury Demand**

Plaintiffs demand trial by jury.