UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
GREATER NEW YORK TAXI ASSOCIATION   :    13 Civ. 3089 (VSB) (JCF)
and EVGENY FREIDMAN,                :
                                    :         MEMORANDUM
              Plaintiffs,           :         AND   ORDER
                                    :
       - against -                  :
                                    :
THE CITY OF NEW YORK, THE NEW YORK  :
CITY TAXI & LIMOUSINE COMMISSION,   :
a New York City charter-mandated    :
agency, MICHAEL R. BLOOMBERG,       :
individually and in his capacity    :       ┌─────────────────────────────┐
as Mayor of the City of New York,   :       │ USDS SDNY                   │
DAVID YASSKY, individually and in   :       │ DOCUMENT                    │
His capacity as Chairman of the     :       │ ELECTRONICALLY FILED        │
New York City Taxi and Limousine    :       │ DOC #: _____    │
Commission, and DOES 1-9,           :       │ DATE FILED: 9/11/17         │
individually and in their capacity  :       └─────────────────────────────┘
as agents or employees of the City  :
of New York,                        :
                                    :
              Defendants.           :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

     This case arises out of allegations that the defendants --

the City of New York, the New York City Taxi & Limousine Commission

(the "TLC"), Michael Bloomberg, individually and in his capacity

as Mayor of the City of New York, David Yassky, individually and

in his capacity as Chairman of the TLC, and Does 1-9 -- retaliated

against the plaintiffs -- the Greater New York Taxi Association

("GNYTA") and Evgeny Freidman -- for filing a lawsuit opposing the

TLC's "Taxi of Tomorrow" project.   After failing to resolve

1

numerous discovery disputes out of court, the defendants and the plaintiffs both bring omnibus motions to compel. For the reasons stated below, both motions are granted in part and denied in part.

Background

GNYTA is a trade association that represents approximately 1,500 taxicab medallions operating in New York City. (Third Amended Complaint ("TAC"), ¶ 13). Mr. Freidman owns "a substantial number" of taxicab medallions through four management companies; operates the largest fleet of hybrid and wheelchair accessible medallions in New York City, Philadelphia, Chicago, and New Orleans; and controls more than one-sixth of the "mini fleet" medallions in New York City. (TAC, ¶ 14; Letter of Brett Berman dated April 9, 2015, attached as Exh. 1 to Declaration of Nicholas R. Ciappetta dated April 28, 2017 ("Ciappetta Decl."), at 1). He is also a member of GNYTA's board of directors. (TAC, ¶ 14).

In December 2009, the TLC issued a Request for Proposals to automobile manufacturers to develop the "Taxi of Tomorrow," which would become "New York City's Official Taxicab Vehicle." (TAC, ¶¶ 25, 29). Once selected, all unrestricted medallion owners would be required to purchase the Taxi of Tomorrow to the exclusion of all other makes and models. (TAC, ¶ 25). On May 30, 2011, after considering several proposals, the TLC announced that the Nissan NV200 was selected as the Taxi of Tomorrow. (TAC, ¶ 31). The

City entered into a ten-year contract with Nissan, set to begin in October 2013, granting it the exclusive right to manufacture and supply taxicabs to medallion owners and setting a uniform price for the vehicles. (TAC, ¶¶ 25, 33).

The plaintiffs were concerned about the potential consequences of the Taxi of Tomorrow project, specifically, the loss of their ability to choose their vehicles from among competing manufacturers, a possible fleet-wide recall by Nissan, or an interruption in the availability of replacement parts. (TAC, ¶ 26). Accordingly, on January 18, 2013, the plaintiffs filed an Article 78 proceeding in New York State Supreme Court challenging the implementation of the Initial Taxi of Tomorrow Rules on the grounds that they exceeded the TLC's rule-making authority, were arbitrary and capricious, violated a New York City law promoting hybrid-electric taxis, and violated the Americans with Disabilities Act. (TAC, ¶ 36). This was not the first lawsuit the plaintiffs had filed against the TLC; GNYTA, along with the Metropolitan Taxicab Board of Trade ("MTBOT"), another trade group representing medallion owners, had filed a number of lawsuits against the TLC dating back to 2008 challenging policies that purposefully disadvantaged the taxi industry. (TAC, ¶¶ 37-45).

This lawsuit is based on allegations that the defendants retaliated against the plaintiffs for filing the Article 78

proceeding by selectively enforcing TLC rules violations against them and harming their relationships with certain financial institutions. Specifically, the plaintiffs allege that, after the filing of the Article 78 proceeding, the defendants issued summonses against medallions owned by Mr. Freidman's management companies in enforcement actions that they had previously agreed to postpone indefinitely (TAC, ¶¶ 48, 57); that Mr. Yassky offered to abandon certain enforcement actions against medallions owned by the plaintiffs and their members if the plaintiffs dropped the Article 78 lawsuit (TAC, ¶¶ 61-62); that, when the plaintiffs refused the offer, the defendants escalated their enforcement efforts against the plaintiffs' medallions by, for example, enforcing anachronistic rules that they had not enforced in decades (TAC, ¶¶ 67-68, 72-73, 76, 80, 89-92); that the defendants declined to enforce similar violations against medallions owned by MTBOT members because MTBOT agreed to drop its pending actions against the TLC and support the Taxi of Tomorrow project (TAC, ¶¶ 52-56, 163); that the defendants encouraged the New York State Attorney General to file a lawsuit against Mr. Freidman (TAC, ¶¶ 111-12, 121); that Mayor Bloomberg told Mr. Freidman that he would "destroy" the taxicab industry (TAC, ¶ 98); that, when Mayor Bloomberg left office, he invested in Lyft and former TLC officials took jobs at Uber and Lyft -- both competitors of the taxi industry

-- to make good on that threat (TAC, ¶¶ 124-26); and that Citibank, from whom Mr. Freidman had taken out loans, accelerated the balance due on his loans and ultimately ended its banking relationship with him because of pressure put on it by the defendants (TAC, ¶¶ 134-35, 144). Though not mentioned in the operative complaint, the plaintiffs allege in their Amended Initial Disclosures that the defendants' conduct similarly damaged their banking relationship with Capital One. (Amended Initial Disclosures Pursuant to Fed. R. Civ. P. Rule 26(a)(1) ("Amended Initial Disclosures"), attached as Exh. 27 to Ciappetta Decl., at 7).

The defendants move to compel the plaintiffs to (1) produce documents from nine additional custodians; (2) answer several document requests and interrogatories; (3) produce documents dating back to July 1, 2010; and (4) run additional search terms. They also seek permission to depose Mr. Freidman for more than seven hours. The plaintiffs move to compel the defendants to produce documents withheld on the basis of deliberative process privilege, attorney-client privilege, and work product privilege.

Discussion

A.   Standard

The Federal Rules of Civil Procedure permit parties to

obtain discovery regarding any nonprivileged matter that
is relevant to any party's claim or defense and
proportional to the needs of the case, considering the

> importance of the issues at stake in the action, the
> amount in controversy, the parties' relative access to
> relevant information, the parties' resources, the
> importance of the discovery in resolving the issues, and
> whether the burden or expense of the proposed discovery
> outweighs its likely benefit. Information within this
> scope of discovery need not be admissible in evidence to
> be discoverable.

Fed. R. Civ. P. 26(b)(1). "Although not unlimited, relevance, for

the purpose of discovery, is an extremely broad concept." American

Federation of Musicians of the United States and Canada v. Sony

Music Entertainment, Inc., No. 15 Civ. 5249, 2016 WL 2609307, at

*3 (S.D.N.Y. April 29, 2016) (quoting Condit v. Dunne, 225 F.R.D.

100, 105 (S.D.N.Y. 2004)).

Relevant documents must be produced if they are within the

"possession, custody, or control" of the party from whom discovery

is sought. Fed. R. Civ. P. 34(a)(1); see Royal Park Investments

SA/NV v. Deutsche Bank National Trust Co., No. 14 Civ. 4394, 2016

WL 5408171, at *5 (S.D.N.Y. Sept. 27, 2016). Thus, if a document

is not in the responding party's actual possession or custody,

"courts look to see whether the party has control of it, construing

the word 'control' broadly." Royal Park, 2016 WL 5408171, at *5

(quoting Export-Import Bank of the United States v. Asia Pulp &

Paper Co., 233 F.R.D. 338, 341 (S.D.N.Y. 2005)). "[D]ocuments are

considered to be under a party's control when that party has the

right, authority, or practical ability to obtain the documents

from a non-party to the action." <u>United States ex rel. Kester v.</u>
<u>Novartis Pharmaceuticals Corp.</u>, No. 11 Civ. 8196, 2014 WL 6655703,
at *3 (S.D.N.Y. Nov. 24, 2014) (alteration in original) (quoting
<u>Bank of New York v. Meridien BIAO Bank Tanzania Ltd.</u>, 171 F.R.D.
135, 146 (S.D.N.Y. 1997)).   When the party resisting discovery
denies possession or control, "[t]he discovering party bears the
burden of establishing control." <u>S.E.C. v. Strauss</u>, No. 09 Civ.
4150, 2009 WL 3459204, at *7 (S.D.N.Y. Oct. 28, 2009); <u>accord</u>
<u>Golden Trade S.r.L. v. Lee Apparel Co.</u>, 143 F.R.D. 514, 525 n.7
(S.D.N.Y. 1992).

     B.   <u>Defendants' Motion to Compel</u>

        1.   <u>Document Custodians</u>

The plaintiffs have already collected and produced documents
from six custodians, including Mr. Freidman and Ethan Gerber, the
Executive Director and General Counsel of GNYTA.   (Plaintiffs'
Memorandum of Law in Opposition to Defendants' Motion to Compel
("Pl. Opp. Memo.") at 6).   The defendants move to compel production
of documents from nine additional custodians, whom they divide
into two groups: (1) the "GNYTA" Custodians," five former GNYTA
board members; and (2) the "Freidman Custodians," four employees
of Mr. Freidman's taxi management companies.   (Defendants'
Memorandum of Law in Support of Their Motion Pursuant to Federal
Rule of Civil Procedure 37 to Compel Discovery ("Def. Memo.") at

6, 9, 14).

a.    The "GNYTA Custodians"

Yuri Treskunov, Zion Yakuel, Symon Garber, Guy Roberts, and Floren Pereman (collectively, the "GNYTA Custodians"), are former GNYTA board members who each owned their own fleet of taxicab medallions. (Def. Memo. at 5-6; Deposition of Greater New York Taxi Association by Ethan Gerber dated Aug. 20, 2015 ("Gerber Dep."), attached as Exh. 15 to Ciappetta Decl., at 57-61). As board members, they met periodically with Mr. Freidman and Mr. Gerber, usually by telephone, to vote on the major activities GNYTA would undertake, including the decision to file this lawsuit. (Gerber Dep. at 43-46, 146-47). According to Mr. Gerber, they all disassociated from GNYTA between approximately 2011 and 2015 because of the TLC's targeted enforcement against their medallions. (Gerber Dep. at 57-61, 120-21; Letter of James M. Lemonedes dated Aug. 5, 2016 ("Lemonedes 8/5/16 Letter"), attached as Exh. 18 to Ciappetta Decl., at 2).

As an initial matter, these custodians meet Rule 26(b)(1)'s relevance requirement. GNYTA's claim for damages is based in part on losses caused by the disassociation of its board members, such as the loss of payments contributing to funding this litigation. (Gerber Dep. at 120; Amended Initial Disclosures at 7-8). The board members' emails are reasonably likely to shed light on

8

whether they disassociated because of the TLC's targeted
enforcement, as the plaintiffs contend, or if they disassociated
for unrelated reasons, such as dysfunction within GNYTA.  Thus,
the plaintiffs must make an adequate search of their own records
for relevant documents created by the GNYTA Custodians -- for
example, email correspondence between them and Mr. Freidman or Mr.
Gerber -- if they have not already done so.[1]

    That, however, does not end the inquiry.  The defendants seek
more than just documents in the plaintiffs' possession; they seek
to compel the plaintiffs to produce documents in the GNYTA
Custodians' possession as well.[2]   (Def. Memo. at 6-7).   The
plaintiffs contend that they lack control over documents in the
GNYTA Custodians' possession because GNYTA is "a loose association
of fleet owners" and the board members "did not have separate GNYTA
email accounts." (Pl. Opp. Memo. at 7-8 (emphasis omitted)).  The

---

[1] Mr. Gerber testified at his deposition that he searched his
own records for documents created by former GNYTA board members
(Gerber Dep. at 137), but Mr. Freidman has made no such
representation.

[2] Although Mr. Gerber testified that he "would probably have"
any emails concerning the former board members' affiliation with
GNYTA in his possession (Gerber Dep. at 137, 177-78), the
defendants point out that he may not have all relevant emails
written by the GNYTA custodians.   (Def. Memo. at 7 ("[The]
[p]laintiffs do not acknowledge the possibility that GNYTA members
may have corresponded without copying Gerber.  Nor do Plaintiffs
account for responsive emails between GNYTA members and third
parties.")).

defendants counter that numerous courts have held that a corporation has control over its board members, officers, and employees, such that it must produce documents in their possession. See, e.g., Royal Park, 2016 WL 5408171, at *6; Miniace v. Pacific Maritime Association, No. C 04-03506, 2006 WL 335389, at *2 (N.D. Cal. Feb. 13, 2006); Riddell Sports Inc. v. Brooks, 158 F.R.D. 555, 558-559 (S.D.N.Y. 1994). However, none of the GNYTA Custodians is currently a board member, so whatever mechanisms of control GNYTA had over them have since disappeared.[3] And while courts have found that a party has the "practical ability" to obtain documents from a non-party in a number of other

_____

[3] The defendants also argue that the plaintiffs had a duty to preserve and collect responsive documents from board members when litigation became reasonably foreseeable, here, in March 2013, when GNYTA began to contemplate filing this lawsuit. (Def. Memo. at 7-8; Gerber Dep. at 150). At that time, the taxi companies of at least two of the GNYTA Custodians, Mr. Roberts and Mr. Treskunov, were still affiliated with GNYTA. (Gerber Dep. 59-60; Lemonedes 8/5/16 Letter at 2). Thus, the defendants argue that GNYTA should have begun to preserve and collect at least the emails of these two individuals in March 2013. (Def. Memo. at 8). It is true that when litigation becomes reasonably foreseeable, a litigant has a "duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, [or] is reasonably likely to be requested during discovery." Passlogix, Inc. v. 2FA Technology, LLC, 708 F. Supp. 2d 378, 409 (S.D.N.Y. 2010) (quoting Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 72 (S.D.N.Y. 1991)). Here, however, the former board members' emails are relevant to determine their motivation for disassociation. It defies logic to expect the plaintiffs to have collected and preserved documents from board members before the reason why those documents are relevant (their disassociation) had occurred.

10

circumstances, such as where the party and the non-party have a continuing economic relationship, see Royal Park, 2016 WL 5408171, at *6, the defendants have made no showing with regard to any factors that might establish the plaintiffs' practical ability to obtain documents from former GNYTA board members. Therefore, the defendants have not met their burden to establish the plaintiffs' control over documents in the GNYTA Custodians' possession.[4]

b.    The "Freidman Custodians"

i.    Elizabeth Suazo di Paola-Otero

Elizabeth Suazo di Paola-Otero was the Controller of Taxi Club Management Inc. ("Taxi Club"), one of Mr. Freidman's taxi management companies, from July 2007 to July 2014. (Linkedin Profile, Eli Suazo di Paola-Otero ("Paola-Otero Linkedin Profile"), attached as part of Exh. 20 to Ciappetta Decl.).   In this role, she compiled and reported on Taxi Club's medallion mortgage loans, developed relationships with several financial

---

[4] Courts have sometimes required that a party subject to a document request exert the minimal effort of asking a related non-party to produce documents voluntarily.  See Royal Park, 2016 WL 5408171, at *7; Export-Import Bank, 233 F.R.D. at 341; In re Folding Carton, 76 F.R.D. 420, 423 (N.D. Ill. 1977).  In this case, however, there is no reason to believe that such a request would be favorably received.  I will therefore not require the plaintiffs to go through what is likely a futile exercise.  The defendants may, of course, subpoena the documents directly from the former GNYTA board members.

institutions, and served as one of the primary points of contact with Citibank on Mr. Freidman's accounts. (Deposition of Mayra Franceschini dated July 14, 2016 ("Franceschini Dep."), attached as Exh. 33 to Ciappetta Decl., at 130-31; Paola-Otero Linkedin Profile).[5] Her emails are therefore likely to contain correspondence with Citibank and Capital One concerning the deterioration of those banking relationships, which is relevant to both the defendants' liability -- whether the defendants put pressure on the banks to accelerate Mr. Freidman's loans -- and the plaintiffs' damages -- whether concerns about the TLC's selective enforcement caused the banks to accelerate the loans. The plaintiffs shall therefore add Ms. Paola-Otero as a document custodian.

### ii.    Anita Cisneros

Anita Cisneros was the Chief Financial Officer of Taxi Club. (Affidavit of Anita Cisneros, Citibank, N.A. v. Bombshell Taxi LLC, Index No. 650691/2015, ¶ 1 (N.Y. Sup. Ct. June 8, 2015), attached as part of Exh. 21 to Ciappetta Decl.). Like Ms. Paola-

---

[5] The portion of Mayra Franceschini's deposition provided by the defendants does not identify who she is, her affiliation with Citibank, or the litigation in which her deposition was taken. However, her email signature, attached to the defendants' motion as part of another exhibit, identifies her as a Senior Relationship Services Specialist for Citibank. (Emails of Anita Cisneros & Mayra Franceschini dated Oct. 30, 2014 ("Cisneros/Franceschini Emails"), attached as part of Exh. 21 to Ciappetta Decl.).

Otero, Ms. Cisneros communicated with Citibank and Capital One about Mr. Freidman's loans. (Franceschini Dep. at 130-31). Ms. Cisneros is therefore a relevant document custodian for the same reasons as Ms. Paola-Otero. Though the plaintiffs suggest that her emails would be duplicative of Ms. Paola-Otero's (Pl. Opp. Memo. at 10), the defendants provide copies of communications between Ms. Cisneros and employees of both banks on which Ms. Paola-Otero was not included. (Cisneros/Franceschini Emails; Email of Jessica Mendoza dated Feb. 2, 2015, attached as part of Exh. 21 to Ciappetta Decl.). The plaintiffs shall therefore add Ms. Cisneros as a document custodian.

### iii. Mikhail Kats

Mikhail Kats was the Senior Leasing Manager at Woodside Management, Inc., another of Mr. Freidman's taxi management companies. (Affidavit of Mikhail Kats dated July 18, 2013 ("Kats Aff."), attached as part of Exh. 22 to Ciappetta Decl., ¶ 1). In this role, Mr. Kats monitored and oversaw the medallions owned by Woodside Management; other than Mr. Freidman, he was the only person with authority to enter into contracts with medallion owners on Woodside's behalf. (Kats Aff., ¶¶ 3-4; Deposition of Evgeny Freidman, Tom Trans Taxi, Ltd. v. Woodside Management Inc., Index No. 500432/11, at 11 (N.Y. Sup. Ct. July 19, 2013), attached as part of Exh. 22 to Ciappetta Decl.). The plaintiffs challenge his

inclusion as a custodian solely on the ground that he does not possess relevant documents. (Pl. Opp. Memo. at 10-11). However, in his position at Woodside, Mr. Kats likely communicated with medallion owners at the time they disassociated from Woodside. Whether they did so because of the TLC's selective enforcement goes directly to Mr. Freidman's claim for damages based on loss of market share. (Amended Initial Disclosures at 7). Accordingly, the plaintiffs shall add Mr. Kats as a document custodian.

### iv.    Mark Longo

Mark Longo was the Director of Information at GNYTA.[6] (Affidavit of Mark Longo ("Longo Aff."), Greater New York Taxi Association v. New York Taxi & Limousine Commission, Index No. 101083/2013, ¶ 1 (N.Y. Sup. Ct. July 29, 2013), attached as part of Exh. 23 to Ciappetta Decl.). The defendants argue that Mr. Longo is a relevant custodian because he filed an affidavit in the Article 78 proceeding opposing the Taxi of Tomorrow project and communicated with Mr. Freidman about the status of the project. (Def. Memo. at 11). The plaintiffs effectively concede that Mr.

---

[6] Mr. Longo was probably an employee of Taxi Club as well, as he had a Taxi Club email address -- his email signature lists email addresses at four different taxi-related businesses and describes him as holding numerous director-level positions, but does not specify where he held each of those positions. (Email of Mark Longo dated Dec. 3, 2012, attached as part of Exh. 23 to Ciappetta Decl.). It is therefore unclear what position, if any, he held at Taxi Club.

Longo has relevant documents, stating that they will produce "all non-privileged documents concerning the [Taxi of Tomorrow] program they have located . . . includ[ing] communications to and from Mark Longo." (Pl. Opp. Memo. at 11). Although the plaintiffs oppose his inclusion as a custodian, they provide no meaningful basis for doing so. They shall add Mr. Longo as a document custodian.

c. <u>Proportionality</u>

Finally, the plaintiffs contend that the custodians sought by the defendants are not proportional to the needs of the case under Rule 26(b)(1). (Pl. Opp. Memo. at 12-13). Earlier in this litigation, the defendants sought as many as thirty-one additional custodians. (Letter of Nicholas R. Ciappetta dated Oct. 23, 2015, attached as Exh. F. to Declaration of James M. Lemonedes dated May 12, 2017). Had they requested the same number of custodians here, a lengthier discussion of proportionality might be necessary. However, the defendants have whittled that request down to an additional nine custodians, and I have authorized discovery as to only four. Given the seriousness of the allegations levied against the defendants, the amount of money at stake (Amended Initial Disclosures at 7 (alleging "tens of millions of dollars" in damages)), the size of Mr. Freidman's enterprises, and the potential evidentiary value of documents in the custodians'

possession, the additional custodians are proportional to the needs of the case.

### 2. Document Requests

Next, the defendants move to compel the plaintiffs to respond to a number of document requests. They divide the requests into three categories: (1) requests concerning Mr. Freidman's banking relationships with Citibank and Capital One, (2) requests concerning Mr. Freidman's banking relationships with institutions other than Citibank and Capital One, and (3) requests concerning TLC enforcement actions. (Def. Memo. at 16).

### a. Citibank and Capital One

The first category of document requests seeks production of correspondence between the plaintiffs and Citibank and Capital One concerning the formation, development, and deterioration of their banking relationships; documents authored or received by the plaintiffs concerning these relationships; and documents demonstrating Mr. Freidman's compliance with the terms of the Citibank loans. (Document Requests, attached as part of Exh. 26 to Ciappetta Decl., Sixth Set of Requests, Nos. 15-16, 19; Seventh Set of Requests, Nos. 6-7). The plaintiffs, meanwhile, have agreed to produce any responsive documents that directly address TLC enforcement actions but dispute the need to produce anything more. (Pl. Opp. Memo. at 20-21; Letter of James M. Lemonedes dated June

9, 2016, attached as Exh. 11 to Ciappetta Decl., at 5, 10).

The defendants' document requests sweep too broadly, but the production offered by the plaintiffs is too narrow. The defendants argue that the documents are necessary to assess the plaintiffs' allegations that "Citibank had no good-faith reason to accelerate [Freidman's] loans" and that "Citibank's change in attitude towards [the] [p]laintiffs was influenced by [the] [d]efendants."[7] (Def. Memo. at 16-17 (first alteration in original) (quoting TAC, ¶¶ 143-44)). In other words, the relevant documents are those that pertain to the deterioration of the banking relationships between Mr. Freidman and Citibank and Capital One. This would include more than just documents that discuss the TLC's enforcement actions, as the plaintiff offer, but less than the full history of those banking relationships, as the defendants request.

Accordingly, the plaintiffs shall respond to these document requests by producing documents from the time period during which the banking relationships fell apart. The plaintiffs allege that Citibank sent its first notice of termination to Mr. Freidman on May 8, 2014 (TAC, ¶ 136), and do not specify a date on which their relationship with Capital One began to deteriorate (Amended

---

[7] Presumably, pursuant to the plaintiffs' Amended Initial Disclosures, these arguments applies with equal force to Mr. Freidman's banking relationship with Capital One.

17

Initial Disclosures at 7).  Because documents predating May 8, 2014, may contain information regarding the events that led Citibank to accelerate Mr. Freidman's loans and terminate his accounts, the plaintiffs shall respond to the document requests pertaining to Citibank -- Numbers 15, 16, and 19 in the Sixth Set of Requests -- dating back to November 8, 2013, six months before the date that Citibank sent its first notice of termination. Because the parties fail to specify when Capital One took similar actions, the plaintiffs shall respond to the document requests pertaining to Capital One –- Numbers 6 and 7 in the Seventh Set of Requests –- by producing documents dating back to January 18, 2013, the date the plaintiffs filed the Article 78 proceeding that is the basis of their retaliation claim.

b.    Other Banking Relationships

The second category of document requests seeks production of documents containing information about Mr. Freidman's loans with financial institutions other than Citibank and Capital One. (Document Requests, Sixth Set of Requests, No. 20; Seventh Set of Requests, No. 9).  Such documents are at most marginally relevant. The plaintiffs do not allege that the defendants' actions damaged Mr. Freidman's banking relationships with institutions other than Citibank and Capital One.  Still, the defendants contend that these documents are needed to perform a "comparative analysis" to show

how factors other than pressure applied by the defendants and the TLC's enforcement actions might have harmed the plaintiffs' banking relationships with Citibank and Capital One. (Def. Memo. at 17-18). Such a production would require an onerous search of documents by Mr. Freidman, yet it would not directly prove or negate any wrongdoing by the defendants or prove any of the plaintiffs' damages. The defendants' motion to compel the plaintiffs to respond this category of document requests is therefore denied.

### c.   TLC Enforcement Actions

The third category of document requests seeks production of documents concerning the plaintiffs' efforts to comply with enforcement directives issued by the TLC, summonses charging violations of those directives, and efforts to settle those summonses. (Document Requests, Sixth Set of Requests, Nos. 1-6).[8] Documents concerning the plaintiffs' efforts to comply with the TLC's directives and summonses are relevant to the plaintiffs' selective enforcement claim.  If the plaintiffs made little or no

---

[8] The defendants also include Document Request No. 7 from their Sixth Set of Requests in this group. (Def. Memo. at 16). However, this request is unrelated to the others.  It seeks documents concerning a press release allegedly issued by the defendants that disparages Mr. Freidman.  (Document Requests, Sixth Set of Requests, No. 7; TAC, ¶ 8).  Neither party addresses the substance of this document request in their briefs.  I therefore decline to rule on it here.

effort to comply as compared to other medallion owners, the defendants' issuance of summonses was likely justified; if, on the other hand, the plaintiffs made genuine efforts to comply, but the defendants issued summonses anyway, that would suggest a retaliatory motive. Along the same lines, the efforts to settle summonses are relevant to whether the defendants acted reasonably in negotiations, which would refute a retaliatory motive.

The plaintiffs argue that even if the requested documents are relevant, they should not be required to respond to these requests because the defendants "certainly possess whatever documents they relied upon to prosecute these enforcement actions." (Pl. Opp. Memo. at 17). The fact that a party already has information that it seeks through a document request does not necessarily excuse the responding party from complying with the request. See Dew v. 39th Street Realty, No. 99 Civ. 12343, 2001 WL 388053, at *1 (S.D.N.Y. April 16, 2001) ("[T]he fact that an adversary may already have some of the information it seeks is not an excuse for failing to produce responsive documents."); Scotti v. Johnson, No. 89 Civ. 2064, 1990 WL 144815 (S.D.N.Y. Sept. 20, 1990) ("[T]he fact that the party seeking discovery may already have access to the documents is not necessarily a basis for denying enforcement of a document request . . . ."). Still, where a party "should already have the communications requested," it "has a diminished

'need for discovery.'" Pacific Gas & Electric Co. v. United States, 69 Fed. Cl. 323, 327 (Fed. Cl. 2005) (quoting United States ex rel. Fisher v. Network Software Associates, 217 F.R.D. 240, 246 (D.D.C. 2003)); cf. Mills v. Lempke, No. 11 CV 440, 2012 WL 1574749, at *5-6 (W.D.N.Y. May 3, 2012) (denying document request because party "already ha[d] much of [the] information" sought).

The TLC should certainly have records of the directives and summonses that it issued to the plaintiffs. Indeed, the defendants' document requests list specific dates on which the directives were issued and the specific TLC rules that were violated, information that likely originated from the directives and summonses themselves. (Document Requests, Sixth Set of Requests, Nos. 1-2, 4-5). Therefore, the plaintiffs are not required to search their records for physical copies of the requested directives and summonses. However, the defendants are unlikely to have full documentation of the plaintiffs' efforts to comply with TLC directives or summonses, and they may or may not maintain records of settlement negotiations. The plaintiffs shall therefore produce documents responsive to this category of document requests with the exception of physical copies of the requested directives and summonses.

### 3. Interrogatories

#### a. Fourth Set of Interrogatories, Nos. 4-9

This group of interrogatories asks the plaintiffs to identify persons, other than attorneys, employees of the City of New York, or employees of the United States Courts, with whom they discussed a number of their allegations. (Interrogatories, attached as Exh. 26 to Ciappetta Decl., Fourth Set of Interrogatories, Nos. 4-9; TAC, ¶¶ 5, 10, 60-61, 63-65, 95, 127, 144, 171). The identity of such individuals will help the defendants verify the accuracy of the allegations in the operative complaint. In addition, the defendants point out that the plaintiffs' statements to third parties would be admissible as admissions against interest if they are indeed inconsistent with the plaintiffs' allegations. (Def. Memo. at 19-20). These interrogatories therefore seek relevant information.

Still, the plaintiffs contend that responding to these requests will require an excessively burdensome review of all of their communications with various third parties. (Pl. Opp. Memo. at 15). However, the defendants do not seek such an exhaustive search of records with respect to at least Interrogatory No. 5, which concerns Mayor Bloomberg's alleged threat to "destroy" the taxi industry. All they seek is for "[the] [p]laintiffs' attorneys simply [] to ask Freidman and Gerber with whom they discussed this

allegation." (Def. Memo. at 19). This request places no serious burden on the plaintiffs, and the defendants do not suggest that they seek anything more from the plaintiffs' responses to the other interrogatories in this group. The plaintiffs shall therefore respond to this group of interrogatories by having Mr. Freidman and Mr. Gerber produce a list of people with whom they discussed the allegations, orally and in writing, from their own memories.[9]

### b.   Fourth Set of Interrogatories, No. 12

This interrogatory seeks the identity of all banks or lenders that loaned money to Mr. Freidman or any of his companies. (Interrogatories, Fourth Set of Interrogatories, No. 12). As with the defendants' second category of document requests, this interrogatory is designed to discover information about Mr. Freidman's financial relationships with banks other than Citibank and Capital One. As discussed above, those banking relationships are not at issue here and have minimal probative value. The plaintiffs need not respond to this interrogatory.

---

[9] Importantly, this list is limited to people with whom Mr. Gerber and Mr. Freidman discussed the allegations, not the subject matter underlying the allegations. For example, the list must include people with whom they discussed the allegation that the TLC retaliated against them for opposing the Taxi of Tomorrow project, but need not include people with whom they discussed each individual enforcement action brought by the TLC.

### c.   Fifth Set of Interrogatories, No. 2

This interrogatory seeks the identity of all employees of Mr. Freidman's taxi management companies other than taxi drivers, mechanics, and dispatchers.   (Interrogatories, Fifth Set of Interrogatories, No. 2).   The defendants contend that they need this information in order to obtain the names of additional document custodians.   (Def. Memo. at 21).   However, as noted earlier, the defendants requested as many as thirty-one additional custodians earlier in this litigation.   They provide no valid reason why a full list of Mr. Freidman's employees would reveal additional relevant custodians about whom they are not already aware.   The plaintiffs need not respond to this interrogatory.

### 4.   Document Collection Dates

So far in the litigation, the plaintiffs have collected and produced documents dating back to January 1, 2012.  (Pl. Opp. Memo. at 21).   The defendants move to compel the plaintiffs to produce documents dating back to at least July 1, 2010.   (Def. Memo. 21-22 & n.24).   To be sure, the plaintiffs' publicly criticized the Taxi of Tomorrow project and the TLC instituted enforcement actions against the plaintiffs prior to January 2012.   (Def. Memo. at 22).   However, the crux of the plaintiffs' allegations is that the defendants retaliated against them for filing the Article 78 proceeding in January 2013.   The burden of adding eighteen months

to the plaintiffs' document search vastly outweighs the potential relevance of documents that predate the filing of the Article 78 proceeding by more than one year. Therefore, the defendants' request for the plaintiffs to collect and produce documents from before January 1, 2012, is denied.

     5. <u>Search Terms</u>

The defendants move to compel the plaintiffs to run additional search terms to capture information about the deterioration of the plaintiffs' banking relationships with Citibank and Capital One. (Def. Memo. at 23-24). A court should be reluctant to resolve a motion to compel search terms absent technical expertise:

> Whether search terms or "keywords" will yield the information sought is a complicated question involving the interplay, at least, of the sciences of computer technology, statistics and linguistics. <u>See</u> George L. Paul & Jason R. Baron, <u>Information Inflation: Can the Legal System Adapt?</u>, 13 Rich. J.L. & Tech. 10 (2007). . . . Given this complexity, for lawyers and judges to dare opine that a certain search term or terms would be more likely to produce information than the terms that were used is truly to go where angels fear to tread.

<u>United States v. O'Keefe</u>, 537 F. Supp. 2d 14, 24 (D.D.C. 2008).

The defendants have not provided the necessary expert opinions for me to assess their motion to compel search terms. The application is therefore denied. This leaves the defendants with three options: "They can cooperate [with the plaintiffs] (along with their technical consultants) and attempt to agree on

an appropriate set of search criteria.  They can refile a motion

to compel, supported by expert testimony.  Or, they can request

the appointment of a neutral consultant who will design a search

strategy."[10]  Assured Guaranty Municipal Corp. v. UBS Real Estate

Securities Inc., No. 12 Civ. 1579, 2012 WL 5927379, at *4 (S.D.N.Y.

Nov. 21, 2012).

6.    Deposition of Mr. Freidman

Finally, the defendants seek to depose Mr. Freidman for more

than seven hours, the time limit for depositions under Rule

30(d)(1) of the Federal Rules of Civil Procedure.  However, Rule

30(d)(1) also requires the court to allow more than seven hours

for a deposition "if needed to fairly examine the deponent."

Crawford-Bey v. New York & Presbyterian Hospital, No. 08 Civ. 5454,

2010 WL 2143673, at *4 (S.D.N.Y. May 26, 2010) (quoting Fed. R.

Civ. P. 30(d)(1)).  As the owner of medallions against whom the

defendants allegedly retaliated, a GNYTA board member, and the

subject of Mayor Bloomberg's alleged threat, Mr. Freidman is a

central figure in this action.    The defendants are therefore

---

[10] The first category of document requests in this motion to
compel, to which the plaintiffs must respond, concerns the
deterioration of Mr. Freidman's banking relationships with Capital
One and Citibank -- the same issue addressed by the defendants'
proposed search terms.  I urge the parties to meet and confer to
agree on search terms for the plaintiffs to run to respond to those
document requests.

permitted to depose him for more than seven hours.  The parties
shall meet and confer on a reasonable time limit.

      C.    <u>Plaintiffs' Motion to Compel</u>

     The plaintiffs move to compel the defendants to produce
numerous documents they have withheld on the basis of deliberative
process privilege, attorney-client privilege, and work product
privilege.  I address each category of privilege in turn.

      1.    <u>Deliberative Process Privilege</u>

     The deliberative process privilege protects "documents
reflecting advisory opinions, recommendations and deliberations
comprising part of a process by which governmental decisions and
policies are formulated." <u>Department of the Interior v. Klamath
Water Users Protective Association</u>, 532 U.S. 1, 8 (2001) (quoting
<u>National Labor Relations Board v. Sears, Roebuck & Co.</u>, 421 U.S.
132, 150 (1975)).  The privilege rests on "the obvious realization
that officials will not communicate candidly amongst themselves if
each remark is a potential item of discovery and front page news,
and its object is to enhance 'the quality of agency decisions[]'
by protecting open and frank discussion among those who make them
within the Government."  <u>Id.</u> at 8-9 (citation omitted) (quoting
<u>Sears, Roebuck & Co.</u>, 421 U.S. at 151).  To be protected by the
privilege, a document must be "(1) an inter-agency or intra-agency
document; (2) 'predecisional'; and (3) deliberative."  <u>Tigue v.</u>

_United States Department of Justice_, 312 F.3d 70, 76 (2d Cir. 2002); _accord_ _Brennan Center for Justice at New York University School of Law v. United States Department of Justice_, 697 F.3d 184, 194 (2d Cir. 2012). "Predecisional communications are those communications generated in order to assist the agency decisionmaker in making a decision. Deliberative communications are those relating to the process by which policies are formulated." _MacNamara v. City of New York_, No. 04 Civ. 9612, 2007 WL 755401, at *9 (S.D.N.Y. March 14, 2007) (quoting _Marisol A. v. Giuliani_, No. 95 Civ. 10533, 1998 WL 132810, at *6 (S.D.N.Y. March 23, 1998)).

The deliberative process privilege is a qualified one. Courts must "balance an agency's interest in nondisclosure against a litigant's need for the information and, to some extent, the public's interest in open government when deciding whether to uphold the privilege.'" _New York v. Salazar_, 701 F. Supp. 2d 224, 237 n.9 (N.D.N.Y. 2010); _see also_ _MacNamara_, 2007 WL 755401, at *9. Thus, "[t]he privilege may be inapplicable where the agency's deliberations are among the central issues in the case." _Natural Resources Defense Council, Inc. v. Fox_, No. 94 Civ. 8424, 1998 WL 158671, at *5 (S.D.N.Y. April 6, 1998); _accord_ _Anilao v. Spota_, No. 10 CV 32, 2015 WL 5793667, at *19 (E.D.N.Y. Sept. 30, 2015).

On April 19, 2015, the Honorable Vernon S. Broderick,

28

U.S.D.J., ordered the defendants to "review their deliberative process redactions that 'implicate the central issues to the case' and, if necessary, make appropriate disclosures." (Order dated August 19, 2015, at 2). The defendants removed a majority of their deliberative process redactions in response to Judge Broderick's Order. (Plaintiffs' Memorandum of Law in Support of Motion to Compel Discovery ("Pl. Memo.") at 5; Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Compel the Production of Privileged Documents ("Def. Opp. Memo.") at 2). Now, the plaintiffs contend that many of the defendants' remaining deliberative process redactions should be removed because they likewise implicate central issues in this case.[11] (Pl. Memo. at 6-7).

Approximately eighty-one documents produced by the defendants contain deliberative process privilege redactions. (Def. Opp. Memo. at 8). The plaintiffs provide two examples of redactions

---

[11] The defendants counter that ruling on the validity of their deliberative process redactions would be "premature" because they have not produced a privilege log. (Def. Memo. at 8-9). However, the defendants have had ample time to do so. In September 2015, they promised to produce a privilege log for any deliberative process redactions they retained after Judge Broderick's Order. (Letter of Nicholas R. Ciappetta dated Sept. 18, 2015, at 1). The plaintiffs should not face further delay because the defendants failed to fulfill that promise.

that they view as improper.[12]  The first is an email chain among a number of TLC officials discussing whether to suspend eighteen of Mr. Freidman's medallions.  (Emails dated March 20-21, 2013, attached as Exh. G to Declaration of James M. Lemonedes dated April 28, 2017 ("Lemonedes 4/28/17 Decl."); Def. Opp. Memo. at 5).  The second is an email chain among TLC commissioners discussing the adoption of revised rules for the Taxi of Tomorrow project after the state court struck down the Initial Taxi of Tomorrow Rules in the Article 78 proceeding.  (Emails dated May 17-18, 2013, attached as Exh. H to Lemonedes 4/28/17 Decl.; Def. Opp. Memo. at 5).

These examples provide a useful framework for resolving the parties' deliberative process privilege dispute.  The first email chain, discussing whether to suspend Mr. Freidman's medallions, implicates a central issue in this case -- what motivated the defendants in taking adverse enforcement actions against the plaintiffs.[13]  "[W]hen the decision-making process itself is the

---

[12] The plaintiffs attach six additional examples of documents with deliberative process redactions that they view as improper to their reply brief.  (Plaintiffs' Reply Memorandum of Law in Support of Motion to Compel Discovery ("Pl. Reply") at 5-7; Declaration of James M. Lemonedes dated May 26, 2017, Exhs. A-F).  Because the defendants did not have an opportunity to respond to the plaintiffs' arguments regarding these exhibits, I do not address them individually here.  However, my ruling on this motion applies equally to them as it does to the plaintiffs' other deliberative process redactions.

[13] The defendants "represent that the redact[ed] portions of

subject of the litigation, the deliberative process privilege cannot be a bar to discovery." Anilao, 2015 WL 5793667, at *19 (quoting Children First Foundation, Inc. v. Martinez, No. 01 CV 927, 2007 WL 4344915, at *7 (N.D.N.Y. Dec. 10, 2007)); accord Gisbert Construction Co. v. Engeleiter, No. 90 Civ. 5803, 1991 WL 74652, at *1 (S.D.N.Y. May 1, 1991). Conversely, the second email chain, discussing proposed revisions to the Taxi of Tomorrow Rules, does not implicate a central issue in this case -- the plaintiffs do not allege that the adoption or revision of the Taxi of Tomorrow Rules themselves constituted unlawful retaliation. Therefore, the defendants shall review their deliberative process privilege redactions anew and remove any redactions that implicate the defendants' decision-making process in individual enforcement actions against the plaintiffs. The defendants may retain deliberative process redactions only where they protect predecisional, deliberative communications about agency policy, such as the formulation of the Taxi of Tomorrow Rules, and do not concern enforcement actions against the plaintiffs. The defendants must also produce a privilege log for the redactions

---

the email chain do not link the contemplated enforcement to [the] [p]laintiffs' filing of their Article 78 proceeding." (Def. Opp. Memo. at 5). The fact that the redacted emails make no express link between the suspension decisions and the Article 78 proceeding does not mean they will not shed light on the defendants' motivation for its enforcement decisions.

they retain along with the required disclosures.

## 2. Attorney-Client Privilege

The attorney-client privilege protects from disclosure "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." In re County of Erie, 473 F.3d 413, 419 (2d Cir. 2007); accord United States v. Ghavami, 882 F. Supp. 2d 532, 536 (S.D.N.Y. 2012). Obtaining or providing legal advice need not be the sole purpose of the communication; rather, the touchstone is "whether the predominant purpose of the communication is to render or solicit legal advice." In re County of Erie, 473 F.3d at 420; accord United States v. Mount Sinai Hospital, 185 F. Supp. 3d 383, 389 (S.D.N.Y. 2016). The privilege protects both the advice of the attorney to the client and the information communicated by the client that provides a basis for giving advice. See Upjohn Co. v. United States, 449 U.S. 383, 390 (1981); Chen-Oster v. Goldman, Sachs & Co., 293 F.R.D. 547, 554 (S.D.N.Y. 2013). "[T]he burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship . . . ." In re Grand Jury Subpoena Dated January 4, 1984, 750 F.2d 223, 224 (2d Cir. 1984); Ghavami, 882 F. Supp. 2d at 536.

The plaintiffs argue that the defendants improperly invoked the attorney-client privilege on (1) fifty-seven memoranda concerning the enforcement of leasecap violations (the "Leasecap Enforcement Memoranda"); (2) three email chains among TLC officials; and (3) communications where none of the attorneys is a member of the Corporation Counsel's Office or the TLC "legal bureau."[14] (Pl. Memo. at 8-12).

a.   Leasecap Enforcement Memoranda

The defendants' invocation of the attorney-client privilege on the Leasecap Enforcement Memoranda is proper.  David Ross, a prosecuting attorney at the TLC, authored the memoranda to Sherry Cohen, an Assistant Commissioner of Prosecution at the TLC; they involve "decisions concerning prosecution" and "anticipated litigation"[15] regarding the enforcement of leasecap violations

---

[14] The plaintiffs also challenge the invocation of attorney-client privilege on "two attorney notes concerning leasecap enforcement." (Pl. Memo. at 12).  However, those notes are only withheld on the basis of work product privilege.  (New York City Law Department -- Categorical Privilege Log ("Privilege Log"), attached as Exh. I to Lemonedes 4/28/17 Decl., NYC-P 56-57). Accordingly, I do not address them in this section.

[15] The defendants define "decisions concerning prosecution" as documents "reflecting or requesting legal advice . . . [regarding] the decision to commence enforcement, the issuance of summonses/directives, the prosecution of summonses, and the decision to resolve the [] action." (Privilege Log, Categories). They define "anticipated litigation" as documents "reflecting or requesting legal advice . . . in connection with anticipated litigation." (Privilege Log, Categories).

33

against various taxi management companies, including some of the plaintiffs' companies.[16] (Privilege Log at NYC-P 1-55, 58-59).

The plaintiffs argue that the attorney-client privilege cannot apply to these documents because they are communications between two attorneys. (Pl. Memo. at 8-9). However, "[i]n the governmental context, the 'client' may be the agency and the attorney may be an agency lawyer." Adamowicz v. Internal Revenue Service, 672 F. Supp. 2d 454, 470 (S.D.N.Y. 2009) (quoting Tax Analysts v. Internal Revenue Service, 117 F.3d 607, 618 (D.C. Cir. 1997)); accord Maki v. United States, No. 07 CV 443, 2008 WL 1756330, at *4 (W.D. Va. April 16, 2008). Indeed, "it is not uncommon for [government] attorneys to participate in the provision of legal advice in dual capacities -- both giving legal advice to agency employees and requesting legal advice from in-house or outside counsel." Davis, 2012 WL 612794, at *11 n.15. Accordingly, a communication between two government attorneys may be protected by the attorney-client privilege where one attorney

---

[16] The plaintiffs argue that this description is insufficient to determine whether the attorney-client privilege applies. (Pl. Memo. at 9). That argument is without merit. See Davis v. City of New York, No. 10 Civ. 699, 2012 WL 612794, at *11 (S.D.N.Y. Feb. 27, 2012) (party met burden to establish attorney-client privilege where it "identified the author and recipient" of the document and "provided a description of the document which either include[d] a legal term of art . . . or some other language suggesting the document relate[d] to legal advice").

"play[s] the role as the requester of legal advice on behalf of the [agency]."  Id.

The Leasecap Enforcement Memoranda fit into that paradigm. As an Assistant Commissioner of Prosecution, Ms. Cohen had authority to decide whether the TLC would prosecute taxi management companies, sometimes on her own and sometimes in consultation with other TLC officials.  (Def. Opp. Memo. at 12-13).   In the memoranda, Mr. Ross is giving her legal advice about how to proceed against taxi management companies based on the findings of his investigations.  (Def. Opp. Memo. at 12-13).   Thus, Ms. Cohen was effectively the "requester of legal advice" on behalf of the TLC -- advice that she used to decide what enforcement actions the agency (the client) would take.[17]   Additionally, the defendants

_____

[17]   To refute this line of reasoning, the plaintiffs cite Jackson v. City of New York, No. 05 Civ. 721, 2006 WL 2789990 (S.D.N.Y. Sept. 27, 2006).  Jackson involved a memorandum authored by an attorney in the Advocate's Office of the New York Police Department (the "NYPD") to a supervising attorney in that office; the memorandum summarized the results of an investigation into two officers' alleged improper conduct and made recommendations as to appropriate disciplinary action.  Id. at *1.   The supervising attorney then relayed those recommendations to the Commander of the Advocate's Office, the final decision-maker with respect to disciplinary action.  Id. at *3.  The court held that the attorney-client privilege did not apply to this memorandum because the communication was "between two attorneys, with no indication that any advice contained in it was to be communicated to a client." Id. at *2.

The Leasecap Enforcement Memoranda are indeed similar to the memorandum at issue in Jackson.   Here, as in Jackson, an agency

assert that the memoranda were intended to be kept confidential and have in fact been kept confidential within the agency (Def. Opp. Memo. at 12-13), which the plaintiffs do not dispute. The defendants have therefore met their burden to establish that the Leasecap Enforcement Memoranda are protected by the attorney-client privilege.[18]

    b.    Emails

The plaintiffs argue that three email chains contain improper attorney-client privilege redactions. (Pl. Memo. at 10-11; Lemonedes 4/28/17 Decl., Exhs. H, K-L). The defendants respond that the redacted emails in the first email chain, attached as Exhibit H to their motion, are "an implicit request for legal

_____

attorney is summarizing the results of his investigations to a supervisor and giving legal advice about how the agency should proceed based on his findings. However, as discussed above, the Leasecap Enforcement Memoranda were intended to provide legal advice to the client (the TLC). This distinguishes them from the memorandum at issue in Jackson, which the court concluded was not intended to be communicated to the "client." I will not pass on the correctness of that conclusion, except to note that another court in this District more recently found similar communications between two NYPD attorneys to be protected by the attorney-client privilege where, as here, one attorney "played the role as the requester of legal advice on behalf of the [agency]." Davis, 2012 WL 612794, at *11 n.15.

    [18]  The defendants also withhold the Leasecap Enforcement Memoranda on the basis of work product privilege. (Privilege log, NYC-P 1-55, 58-59). Because I have found that the Leasecap Enforcement Memoranda are protected by the attorney-client privilege, I do not reach that issue.

advice" because Meera Joshi, then-Deputy Commissioner of Legal Affairs and General Counsel for the TLC, is copied on the emails, and because the emails discuss proposed revisions to the Taxi of Tomorrow Rules after the state court invalidated the initial rules in the Article 78 proceeding. (Def. Opp. Memo. at 16-17; Lemonedes 4/28/17 Decl., Exh. H). "[A] document can be found to be privileged where it constitutes an implicit request for legal advice and the other elements of the privilege are present . . . ." Retail Brand Alliance, Inc. v. Factory Mutual Insurance Co., No. 05 Civ. 1031, 2008 WL 622810, at *2 (S.D.N.Y. March 7, 2008). Courts have held that communications constitute implicit requests for legal advice where an attorney is copied on the communications and the communications implicate specific legal issues. Compare ADT Security Services, Inc. v. Swenson, No. 07-2983, 2010 WL 2954545, at *5 (D. Minn. July 26, 2010) (emails concerning company's response to media coverage about pending lawsuit on which General Counsel was copied were attorney-client privileged as implicit requests for legal advice), and TNI Packaging, Inc. v. Perdue Farms, Inc., No. 05 C 2900, 2006 WL 6654885, at *2 (N.D. Ill. Feb. 28, 2006) ("The suggested revision to the patent application [sent to the client's attorney] was [] an implicit request for legal advice on what should be included in the application."), with Retail Brand Alliance, 2008 WL 622810, at *2

37

(email sent to in-house counsel providing "general corporate information" was not protected as implicit request for legal advice). The redacted emails here fit into that framework; TLC commissioners are communicating about how to craft a new set of legal rules after a court invalidated their initial set of rules, and the TLC's General Counsel was copied on the emails. Therefore, the defendants' attorney-client privilege redactions in Exhibit H are proper.

The defendants support their claim of privilege on the second email chain, attached as Exhibit K to the plaintiffs' motion, merely by asserting that "an agency attorney is either the author or the recipient on each of the redacted portions of the email chain." (Def. Opp. Memo. at 17; Lemonedes 4/28/17 Decl., Exh. K). Absent any representation that the emails either solicit or provide legal advice, the defendants have not met their burden to establish that the redacted emails in Exhibit K are protected by the attorney-client privilege.

The defendants argue that a single redacted email in the third email chain, attached as exhibit L to the plaintiffs' motion, is also protectable as an implicit request for legal advice. (Def. Opp. Memo. at 17 & n.8). The redacted email appears to consist of Mr. Yassky forwarding a conversation between himself and Mr. Freidman that covers a range of topics to a group of TLC employees.

Although Ms. Joshi is copied on the email, there is no indication that it solicits legal advice or implicates a specific legal issue, unlike the redacted emails in Exhibit H. Therefore, the defendants have not met their burden to establish that the redacted email in Exhibit L is protected by the attorney-client privilege.

The defendants shall therefore remove the attorney-client privilege redactions in the email chains attached as Exhibits K and L to plaintiffs' motion.

c.    Remaining Communications

Finally, the plaintiffs seek an order requiring the defendants to produce all documents withheld on the basis of attorney-client privilege "where none of the attorneys is a member of the Corporation Counsel's office or the TLC's legal bureau." (Pl. Memo. at 12). The plaintiffs do not clearly explain their rationale for this request; it appears to be based on their argument, discussed above, that communications between two government attorneys are not protected by the attorney-client privilege and their view that the TLC's prosecuting attorneys are not part of the TLC's "legal bureau." (Pl. Memo. at 9 ("Mr. Ross and Ms. Cohen are prosecuting attorneys. . . . [N]either of them is a member of the TLC's legal department . . . .")). The first assertion is incorrect for the reasons already discussed in connection with the Leasecap Enforcement Memoranda. The second

assertion seems to make a distinction between the TLC's General Counsel's Office and its prosecuting attorneys, but the plaintiff provide no reason why that distinction warrants a blanket prohibition on applying the attorney-client privilege. This request is denied.

### 3. Work Product Privilege

The work product doctrine "shields from disclosure materials prepared 'in anticipation of litigation' by a party or the party's representative, absent a showing of substantial need." United States v. Adlman, 68 F.3d 1495, 1501 (2d Cir. 1995) (quoting Fed. R. Civ. P. 26(b)(3)). The immunity is designed to protect "mental impressions, conclusions, opinions or theories concerning [] litigation." United States v. Adlman, 134 F.3d 1194, 1194 (2d Cir. 1998). A document is prepared "in anticipation of litigation" if "in light of the nature of the document and the factual situation in the particular case, [it] can fairly be said to have been prepared or obtained because of the prospect of litigation." Id. at 1202 (quoting Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, 8 Federal Practice & Procedure § 2024, at 343 (1994)). The party invoking the protection bears the heavy burden of establishing that it applies. In re Grand Jury Subpoena Dated July 6, 2005, 510 F.3d 180, 183 (2d Cir. 2007); In re Initial Public Offering Securities Litigation, 249 F.R.D. 457, 459-60

(S.D.N.Y. 2008).

Courts recognize two types of work product: "fact" work product and "opinion" work product. Fact work product encompasses "factual material, including the result of a factual investigation. In contrast, opinion work product reveals the 'mental impressions, conclusions, opinions, or legal theories of an attorney or other representative,' and is entitled to greater protection than fact work product." In re Grand Jury Subpoena Dated July 6, 2005, 510 F.3d at 183 (citation omitted) (quoting Adlman, 134 F.3d at 1197). A party may discover fact work product where it shows a substantial need for the materials and that it cannot obtain the equivalent information by other means without undue hardship. In re Grand Jury Proceedings, 219 F.3d 175, 190 (2d Cir. 2000); Costabile v. County of Westchester, 254 F.R.D. 160, 167 (S.D.N.Y. 2008). Opinion work product is protected from discovery "unless a highly persuasive showing [of need] is made." In re Grand Jury Proceedings, 219 F.3d at 190 (alteration in original) (quoting Adlman, 134 F.3d at 1204); see also In re Initial Public Offering Securities Litigation, 249 F.R.D. at 460 (stating that opinion work product "is typically given absolute protection").

a.  Attorney Notes

The plaintiffs move to compel the defendants to produce twelve

attorney notes: two of the notes concern leasecap enforcement; seven are notes created in preparation for prosecutions at the New York City Office of Administrative Trials and Hearings ("OATH"); two are notes of complaining witness interviews; and one concerns "failure to comply with TLC directives." (Pl. Memo. at 14; Privilege Log, NYC-P 56-57, 60-66, 68-69, 73).

The leasecap enforcement notes, authored by Mr. Ross, each concern enforcement against a separate taxi management company; they are categorized as "decisions concerning prosecution" and "pending litigation."[19] (Privilege Log, NYC-P 56-57). The plaintiffs do not contest the designation of these documents as attorney work product. Rather, they assert in conclusory fashion that the notes are "critical" to their selective enforcement claims (Pl. Memo. at 14), but make no specific showing as to why the notes contain crucial information that they cannot obtain elsewhere. The leasecap enforcement notes are therefore protectable attorney work product.

The OATH prosecution notes, also authored by Mr. Ross, are "trial outlines and witness examination questions" created in preparation for prosecutions at OATH (Def. Opp. Memo. at 21); they

---

[19] The defendants define "pending litigation" as "[d]ocuments discussing, reflecting[,] or requesting legal advice, or reflecting work prepared at the direction of counsel . . . in connection with pending litigation." (Privilege Log, Categories).

are categorized either as "pending litigation" or as "decisions concerning prosecution" and "pending litigation" (Privilege Log, NYC-P 60-61, 63-64, 66, 68-69).  The plaintiffs argue that the defendants have failed to satisfy Southern District of New York Local Civil Rule 26.2(a)(2)'s requirement that a party invoking the privilege describe the "general subject matter" of the document; specifically, they take issue with the fact that the defendants do not identify who is being prosecuted. (Pl. Memo. at 14).  However, that information is not necessary to establish that the notes were prepared in anticipation of litigation at OATH, which the defendants state clearly in their privilege log.  The plaintiffs then modify their argument, contending that knowing who is being prosecuted is necessary not to establish the privilege itself, but instead to determine whether the prosecutions concern the plaintiffs' taxi management companies, in which case the privilege should be overcome because the plaintiffs have a substantial need for the documents. (Pl. Reply at 13).  Even if the OATH prosecution notes concerned prosecutions against the plaintiffs' companies, however, the plaintiffs make no showing as to their need for information contained in the attorneys' trial preparation materials that could not be obtained elsewhere.  The OATH prosecution notes are therefore protectable attorney work product.

The notes of complaining witness interviews, authored by Mr. Ross and Ji Jiang, another TLC attorney, are categorized as "anticipated litigation." (Privilege Log, NYC-P 65, 73). "A lawyer's notes of an interview of a non-party witness is classic work product and may contain both facts and mental impressions of the lawyer." Institute for Development of Earth Awareness v. People for Ethical Treatment of Animals, 272 F.R.D. 124, 125 (S.D.N.Y. 2011); see also Strauss, 2009 WL 3459204, at *4-5 (collecting cases). Still, the plaintiffs make similar arguments here as they did with respect to the OATH prosecution notes: that they need information about who is being prosecuted and the identity of the interviewees to determine whether the privilege applies and to assess their need for the documents. This request fails for the reasons already stated in connection with the OATH prosecution notes. The complaining witness notes are therefore protectable attorney work product.

Finally, the note concerning "Failure to Comply with TLC Directives," authored by Mr. Ross, is categorized as "anticipated litigation" and "decisions concerning prosecution." (Privilege Log, NYC-P 62). The defendants assert that this note was also created in preparation for prosecutions at OATH. (Def. Opp. Memo. at 21-22). The plaintiffs do not specifically challenge the invocation of work product privilege on this document or make any

showing as to their need for it.  It is therefore protectable attorney work product for the same reason as the OATH prosecution notes.  In sum, the defendants' invocation of the work product privilege on all twelve attorney notes challenged by the plaintiffs is proper.

b.  <u>MTBOT Documents</u>

Next, the plaintiffs seek five documents concerning the defendants' settlement with MTBOT in which they allegedly agreed to drop enforcement actions against medallions owned by MTBOT members in exchange for MTBOT agreeing to support the Taxi of Tomorrow project.  (Pl. Memo. at 15; TAC, ¶¶ 52-56, 163).  The documents, authored by TLC attorney Chris Wilson, are two draft settlement agreements, two agendas for settlement meetings with MTBOT, and one set of attorney notes of a meeting with MTBOT. (Privilege Log, NYC-P 78-82).  The plaintiffs do not challenge the invocation of the work product doctrine on any of these documents; the defendants' invocation of the immunity is indeed proper.  <u>See</u> <u>N.V. Organon v. Elan Pharmaceuticals, Inc.</u>, No. 99 Civ. 11674, 2000 WL 520622, at *2 (S.D.N.Y. May 1, 2000) (documents like draft settlement agreements that are "produced . . . for the purpose of resolving a dispute that would otherwise be litigated" are protectable attorney work product).

Instead, the plaintiffs assert that the documents must be

produced because the settlement with MTBOT is central to the plaintiffs' selective enforcement claim. (Pl. Memo. at 15). However, the defendants represent that they have already given the plaintiffs the final settlement agreement and any draft versions of the agreement they exchanged with MTBOT, as well as numerous emails between the TLC and MTBOT regarding the negotiations (Def. Opp. Memo. at 23), which the plaintiffs do not dispute. Still, the plaintiffs contend that, at a minimum, the documents produced for internal use only -- the meeting agendas and the notes of the meeting -- are necessary because they "reveal exactly what the TLC discussed with MTBOT, and would therefore reveal whether the TLC agreed to treat MTBOT differently from [the] [p]laintiffs in exchange for MTBOT's support of the Taxi of Tomorrow Program." (Pl. Reply at 14). However, the plaintiffs have not shown that they are unable to obtain this information elsewhere, such as in the documents already produced by the defendants or by deposing the MTBOT members involved in the negotiations. Therefore, the MTBOT documents are protectable attorney work product.

c.   Committee for Taxi Safety Meeting Note

The plaintiffs next move to compel production of a single set of notes drafted by Mr. Wilsonyh in preparation for a settlement meeting with the Committee on Taxi Safety ("CTS"), a taxi industry group; the notes purportedly discuss the enforcement of double-

shifting violations and the Taxi of Tomorrow project. (Privilege Log, NYC-P 83; Letter of Nicholas R. Ciappetta dated May 25, 2016 ("Ciappetta 5/25/16 Letter"), attached as Exh. Q to Lemonedes 4/28/17 Decl., at 4). The plaintiffs do not challenge the designation of these notes as attorney work product, but argue that they have a substantial need for the notes because the defendants' "enforcement actions (or lack thereof) against entities based on their position with respect to the Taxi of Tomorrow project is a central issue in this litigation." (Pl. Memo. at 15). This assertion again fails to specify why plaintiffs have a need for information in these notes that could not be obtained elsewhere. The CTS settlement meeting notes are therefore protectable attorney work product.

### d.  Notes of Meeting with Attorney General

Finally, the plaintiffs move to compel the defendants to produce notes authored by TLC attorney Jason Gonzalez of a meeting with the New York State Attorney General's Office about the potential for that office to commence an investigation of the plaintiffs; the documents are marked "anticipated litigation" and "decisions concerning prosecution." (Privilege Log, NYC-P 84-85; Ciappetta 5/25/16 Letter at 4). The plaintiffs argue that the notes are fact work product because they merely record the contents of the meeting. (Pl. Memo. at 16). However, an attorney's mental

processes are implicated when he or she "exercises selective judgment in determining what is worthy of being written down." S.E.C. v. Nadel, No. 11 CV 215, 2012 WL 1268297, at *7 (E.D.N.Y. April 6, 2012) (quoting S.E.C. v. Sentinel Management Group, Inc., No. 07 C 4684, 2010 WL 4977220, at *9 (N.D. Ill. Dec. 2, 2010)). Thus, the notes of the meeting with the Attorney General's Office constitute opinion work product.

The plaintiffs have not made the requisite highly persuasive showing of need for these notes to overcome the privilege. Though they argue that deposing the meeting participants would not enable them to get the same information that is contained in the notes because the memories of meeting participants are likely diminished (Pl. Reply at 15), the plaintiffs have not provided any evidence that the memories of meeting participants have in fact faded. Therefore, the notes of the meeting with the Attorney General's Office are protectable attorney work product.[20]

Conclusion

For the reasons discussed above, the defendants' motion to compel (Docket no. 111) and the plaintiffs' motion to compel

---

[20] The plaintiffs also seek an order compelling the defendants to refrain from using the work product privilege in the future on any documents that "squarely relate" to the plaintiffs' claims. (Pl. Memo. at 16). As discussed above, that is not the standard for overcoming the work product privilege. This request is denied.

(Docket no. 110) are both granted in part and denied in part. Within forty-five days of this Order, the plaintiffs shall:

- Add the four "Freidman Custodians" as document custodians.

- Respond to Document Request Nos. 15, 16, and 19 in the Defendants' Sixth Set of Document Requests with documents dating back to November 8, 2013.

- Respond to Document Request Nos. 6 and 7 in the Defendants' Seventh Set of Document Requests with documents dating back to January 18, 2013.

- Respond to Document Request Nos. 1 through 6 in the Defendants' Sixth Set of Document Requests, with the caveat that the plaintiffs need not produce physical copies of directives and summonses issued by the TLC.

- Respond to Interrogatory Nos. 4 through 9 in the Defendants' Fourth Set of Interrogatories.

Within forty-five days of this Order, the defendants shall:

- Produce all documents withheld on the basis of deliberative process privilege that implicate decision-making in individual enforcement actions against the plaintiffs' medallions, and produce a privilege log for any documents the defendants continue to withhold on the basis of deliberative process privilege.

- Remove the attorney-client privilege redactions from the email chains attached as Exhibits K and L to the Declaration of James M. Lemonedes dated April 28, 2017, and produce those email chains to the plaintiffs.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:     New York, New York
           September 11, 2017

Copies transmitted this date:

James M. Lemonedes, Esq.
Mark Schenker, Esq.
Fox Rothschild, Attorneys at Law (NYC)
101 Park Avenue, Suite 1700
New York, NY 10178

Brett A. Berman, Esq.
Fox Rothschild, Attorneys at Law
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222

Nicholas R. Ciappetta, Esq.
Emily Stitelman, Esq.
NYC Law Department
100 Church St.
New York, NY 10007